BENJAMIN FOSTER COMPANY *vs.* COMMONWEALTH.

Suffolk.     December 7, 1944. — May 7, 1945.

Present: FIELD, C.J., QUA, DOLAN, RONAN, & WILKINS, JJ.

*Contract,* What constitutes, Building contract, Rescission, Construction, Performance and breach. *Fraud. Warranty. Practice, Civil,* Auditor: findings; Inferences.

In a case referred to an auditor whose findings were to be final, findings of the auditor which are not inconsistent with each other and which are not shown by the report to be erroneous in law are binding upon the trial court and upon this court, except that the auditor's conclusions of fact reached solely by way of inference from other facts are open to review as matter of fact by the trial court and by this court, and either court may draw additional inferences from facts found. Per QUA, J.

The mere fact, that there was an ambiguity on plans included in a signed building contract containing a provision that questions as to the interpretation of the plans and specifications should be decided by an engineer, furnished no ground for a contention that the minds of the parties never met and that no contract ever came into existence.

Approval of a "plan of operation" which an elaborate building contract

required the contractor to submit to show the manner of doing the work called for by the contract was not a condition precedent to the existence of the contract, which must be deemed to have been made on the day of its execution by the parties.

A contractor was not entitled to rescind a contract with the Commonwealth for the construction of an embankment to the satisfaction of its engineer on the ground that he was induced to enter into the contract by fraud consisting of nondisclosure by the engineer of his decision not to allow all the material for the embankment to be taken from a certain convenient borrow area but, within powers given him under the contract, to require at least some of it to be taken from another, less convenient borrow area, where it was found that, although the contractor hoped and expected to use only the convenient area, he contemplated the possibility of using the less convenient area also, that even if he had known of the engineer's decision he would not have refused to enter into the contract and his bid would not have been higher, and that loss subsequently sustained by the contractor through being required to cease using the convenient area was not attributable to the nondisclosure.

A reading of an entire contract with the Commonwealth for the construction of an embankment did not show that there was any implied warranty to the contractor that he would be allowed to obtain all the necessary materials from a certain convenient borrow area.

Broad powers given, by a contract with the Commonwealth for the construction of a large earthen embankment at a unit price, to the engineer of the Commonwealth to control the performance of the work in order to ensure proper construction, although they did not authorize the engineer to abrogate or change the contract and must be exercised for the purpose of carrying out the work originally intended, did authorize decisions by the engineer, made in the free exercise of his own best judgment in good faith, by reason of which he ordered an increase in the thickness of and the proportion of fine material in the core of the embankment resulting in the contractor's having to obtain material from a less convenient borrow area and in the wasting of fine material, and also ordered a temporary change in the method of bringing in and placing material; and the requirements so made of the contractor by the engineer's decision were not a breach of the contract.

Provisions of a contract with the Commonwealth for the construction of an embankment made the engineer of the Commonwealth a quasi arbitrator respecting broad powers given him to control the performance of the work in order to ensure proper construction, and his decisions arrived at in the free exercise of his own best judgment in good faith were not controlled by any extrinsic standard of reasonableness or necessity.

PETITION, filed in the Superior Court on September 17, 1940.

The case was heard by *Goldberg*, J., upon an auditor's report.

*D. Stoneman,* (*W. E. McCurdy* with him,) for the petitioner.

*R. T. Bushnell,* Attorney General, (*J. G. Bryer,* Special Assistant Attorney General, with him,) for the Commonwealth.

QUA, J.   This petition is prosecuted under G. L. (Ter. Ed.) c. 258 to recover for work done and for damages sustained by the petitioner acting as contractor for the metropolitan district water supply commission (St. 1926, c. 375; St. 1927, c. 321) in respect to "Item 8" of "Contract No. 52," dated August 24, 1936, relating to the construction of the embankment for the main dam of Quabbin Reservoir. The work out of which this litigation arises was performed during the spring, summer and autumn seasons of the years 1937 and 1938.

The petitioner contends that no express contract ever came into existence between the parties, or that if such contract did come into existence the petitioner was induced to enter into it by representations made in behalf of the Commonwealth which were substantially false or which were at least only half truths that by reason of concealment of material facts amounted to fraud, and that the Commonwealth broke the contract after it was made. Claim 1 of the petition is a claim to recover $892,581.30 and interest for breach of contract in several respects which, in so far as they are still pressed, will be dealt with later in this opinion.   Claim 2 appears to be a claim for damages for deceit, but since damages cannot be recovered against the Commonwealth in tort, *Arthur A. Johnson Corp.* v. *Commonwealth, ante,* 88, 92, this claim need not be further considered.   Claim 3 is for an undisputed balance most of which has now been paid.   An offer of judgment has been made for the remainder.   This claim is no longer in controversy.   Claim 4 is to recover $892,581.30 and interest on quantum meruit for work and materials and rests upon the theory that no express contract ever came into existence or upon the theory of rescission of the contract for the alleged fraud.   *Long* v. *Athol,* 196 Mass. 497, 506.   Claims 1 and 4 are in the alternative.   No ques-

tion has been raised as to the propriety and sufficiency of the pleadings. We treat claims 1 and 4 as adequate bases for recovery on the grounds contended for by the petitioner, if necessary facts have been established.

The case was heard by an auditor whose findings of fact were to be final. Where cases are referred in this way findings of the auditor which are not inconsistent with each other and which are not shown by the report to be erroneous in law are binding upon the trial court and upon this court, except that the auditor's conclusions of fact reached solely by way of inference from other facts are open to review as matter of fact by the trial court and by this court, and either court may draw additional inferences from facts found. *United States Fidelity & Guaranty Co.* v. *English Construction Co.* 303 Mass. 105, 109–112. *Galluzzi* v. *Beverly,* 309 Mass. 135. See *Arthur A. Johnson Corp.* v. *Commonwealth,* 306 Mass. 347, 350, 351.

In compliance with an order of the court the auditor filed a report on questions of liability only. Thereupon the trial judge ruled that the petitioner was not entitled to recover for work performed and furnished in connection with "Item 8," except as hereinafter stated. He denied a motion of the petitioner that the court determine that the respondent is liable to the petitioner for work performed and furnished and order further hearings upon the question of damages, and he allowed motions of the respondent for judgment in its favor on claims 2 and 4 and that "a final decision . . . be entered" in its favor on claims 1 and 3 in so far as they relate to "Item 8" of "Contract 52," except as to the balance admittedly due of $12,801.64. He then reported his action upon the motions. G. L. (Ter. Ed.) c. 231, § 111. The action of the judge is a decision in favor of the respondent of all issues argued before us.

The embankment of the main dam, now known as Winsor dam, is about a half mile in length and rises to a height of about one hundred seventy feet above the original valley surface. It crosses the bed of Swift River. Its ends rest upon hills on each side of the river. It is constructed of

earthen materials. According to the "Information for Bidders" which accompanied the contract it is about eight hundred feet wide between the upstream and downstream faces at a distance of one hundred thirty feet from the top, toward which the slopes taper. It creates a lake of an area of about thirty-nine square miles. It was estimated to contain three million five hundred fifty thousand cubic yards of earth. The total bid of the petitioner for all the work contained in "Contract No. 52" was $2,317,445. Of this sum $1,136,000 was for the embankment, calculated at a unit price per cubic yard. The embankment was designated as "Item 8."

The embankment was required to be built by the so called full hydraulic method. The dominating characteristics of this method may be described as follows. The embankment is built upon a foundation which is in the form of a very broad shallow trough, the lowest part of which is along the center line of the dam. The materials of which the dam is to be composed, such as earth, sand, gravel, and small stones, are mixed with water and sluiced through pipes upon the sides of the trough at their outer edges. The coarsest and heaviest materials come to rest near what are to be the outside faces of the dam. Finer materials are deposited farther down along the slopes of the trough, called the beaches, while the finest materials of all, called fines, are held in suspension in the water, which gathers in a long, narrow pool running lengthwise of the dam along its center line. The fines are slowly precipitated in the form of thin mud in the center of the dam. The edges of the pool on either side at any given time are determined by the extent to which solid material has been allowed to run down the beaches into the water, that is to say, by the sluicing limits. The pool gradually rises as the dam is built but does not necessarily become deeper, since the deposit of fine material constantly raises the level of its bottom. The coarse materials near the outside of the dam constitute the shoulders and give the dam strength and resisting power but are pervious to water, while the fines precipitated in the pool along the center of the dam be-

come gradually consolidated and form the core, which is fairly impervious to water and prevents undue loss by percolation through the embankment.

. It is readily apparent that the safety and usefulness of a structure of the kind described, with its appurtenances, are dependent upon the constant supervision by skilled engineers of the details of the work during the process of erection, and also that much depends upon the sluicing of proper proportions of coarse materials and fines at the different stages of the work. Accordingly, it is not surprising that the contract throughout contains provisions worded in various ways requiring, in effect, that practically all of the work under "Item 8" shall be performed according to the orders and to the satisfaction of the chief engineer or his assistants. These provisions are detailed, explicit, and emphatic. To a large extent the case hinges upon them. To many of them reference will be made later in this opinion. Whenever in this opinion the word engineer is used in quotations from the contract or otherwise, whether in the singular or in the plural, it refers, unless otherwise indicated, to the chief engineer in the service of the Commonwealth and his assistants acting under his authority.

1. The petitioner contends that there was no express contract and that it can recover quantum meruit for the reason that the minds of the parties never met on the matter of the thickness of the core. Section plans of the embankment showed a "theoretical core line" which was intended to represent the boundary within which all materials should be fines or suitable core material, with no admixture of transitional material, but which the petitioner understood represented only the average line of the core face within which some incursion of transitional material would be permitted in the course of the work. The petitioner cites *Vickery* v. *Ritchie*, 202 Mass. 247, *Lonnqvist* v. *Lammi*, 240 Mass. 371, and similar cases. See *Murphy* v. *Mitchell*, 254 Mass. 18, 21; *Andrade* v. *Hanley*, 289 Mass. 335. But findings of the auditor and the plans themselves make it clear that there was at most an ambiguity in the contract (including the plans) which the

parties saw fit to sign. That there was such ambiguity an examination of the plans and explanatory notes upon them would have revealed to the petitioner. The fact that an executed written contract contains within itself difficulties. of construction about which the parties disagree does not enable a party to contend that the minds never met. By signing the writing the parties bind themselves to such interpretation as the court may place upon the words and symbols employed by them. *Miller* v. *Lord*, 11 Pick. 11, 24. *Rice* v. *Dwight Manuf. Co.* 2 Cush. 80, 86–87. *Sawyer* v. *Hovey*, 3 Allen, 331, 333. *Deutsch* v. *Pratt*, 149 Mass. 415, 420. *Letts-Parker Grocer Co.* v. *W. R. Marshall & Co. Inc.* 232 Mass. 504. Williston on Contracts (Rev. ed.) § 95 (page 304), see §§ 606, 607.

Moreover, in this instance the contract itself provided a method by which questions of interpretation should be determined. It contained a clause that the engineer should decide "all questions which . . . [might] arise as to the interpretation of the plans and specifications used . . . ." The engineer interpreted the "theoretical core line" as marking the limit to which material not suitable for the core should be permitted to penetrate in the normal process of sluicing. Certain markings on the plans tend to support this interpretation. The engineer's decision does not appear to have been arbitrary or made in bad faith. The petitioner is bound by it. *Norcross* v. *Wyman*, 187 Mass. 25, 27. *Marsch* v. *Southern New England Railroad*, 230 Mass. 483, 493–494. *Morgan* v. *Burlington*, 316 Mass. 413, 419–420.

2. We take up next the question of the petitioner's alleged right to rescind the contract for fraud. Any fraud that could be availed of as a ground of rescission must have occurred before the execution of the elaborate formal contract on August 24, 1936. The contract must be deemed to have been made on that day, even though the "Plan of Operation" for building the embankment which the petitioner was required by section 9 of the specifications to submit for approval had not then been approved. The contract itself determined the work to be done. The "Plan of Operation" related only to the manner of doing it and

was incidental.   Approval of the plan for constructing the embankment was not a condition precedent to the existence of a contract.   The contract related to many items in addition to the embankment.   It was a term of the contract itself that after it took effect the contractor must, as provided in the specifications, submit such a plan as the engineer would approve.   The plan of operations was one of the matters subject to the approval of the engineer. Failure to submit a satisfactory plan would be a breach of contract by the petitioner.   The plan might or might not follow one of the five methods of which "studies" had previously been prepared, or might follow one of them in part. Changes in it might be directed or permitted by the engineer without affecting the continuity of the contract.

The petitioner's contention that it was induced to enter into the contract by reason of false representations or of representations of partial truth which amounted to falsehood rests in large part upon findings that the petitioner was caused, by entries upon the plans and by statements of one of the subordinate engineers which in themselves were literally true, to believe that it could build the entire embankment of the modified drift found in the so called lower borrow area, which was convenient and easily worked, whereas in truth the engineers had already decided not to permit it to be built entirely of material taken from that area but to insist that "at least some considerable part of the material" be taken from the so called upper area or some other area containing till, a material less convenient and harder to work.

The auditor found that this nondisclosure was intentional, but that it was not in order to procure a lower bid from the petitioner or from any improper motive.   He found that the engineers had reached their decision honestly believing it their duty to build the best possible dam of the best available materials, and believing that the lower area was deficient in fines, and that fines and coarse materials would be found distributed in it in a manner inconvenient for the building up of the core by the intended process.   The auditor found that the petitioner relied upon the information furnished, but that no misrepresentation of fact was made

to it. He found that it was misled by the nondisclosure; but he also concluded that it was not misled into making the contract; that although it hoped and expected to use the lower area, it contemplated the possibility of excavating from the upper area also and "would not have refused to enter into the contract if it had known that it would be required to do what it was tentatively planning to do." He says that no evidence was offered on the question whether the petitioner's bid would have been substantially higher if the decision had been disclosed and infers that it would not have been. He found that damages subsequently sustained by the petitioner in consequence of being compelled to cease taking material from the lower area were not attributable to the nondisclosure. If these findings stand they are decisive against the contention of the petitioner that it was induced to enter into the contract by nondisclosure of the decision not to allow the embankment to be built entirely from the lower area. It is an essential to rescission for fraud that the alleged fraud should operate as an inducement to enter into the contract. *Harvey* v. *Squire,* 217 Mass. 411, 415. *Ross* v. *Burrage,* 233 Mass. 439, 450–451. *Shikes* v. *Gabelnick,* 273 Mass. 201, 204.

But the petitioner asks us to disregard the auditor's conclusion that the petitioner was not misled into making the contract and to draw the opposite inference that the nondisclosure did materially influence the petitioner to enter into the contract. Even if the auditor's finding was solely by way of inference from other findings and did not go back in whole or in part to the evidence which was before him and is not before us, we are of opinion that we ought to reach the same conclusion that he reached. As it appeared at the outset, and as it turned out, the lower area was more advantageous to the contractor, and a contractor would use it if he could. But all bidders, including the petitioner, were fully informed through the plans and specifications of the proposed contract that there was no guaranty whatever of the suitability of borrow areas, and that the engineers might order the contractor from one area to another or to mix materials from different areas as they

saw fit.   The plan incorporated in the contract on which
were shown the "permitted" borrow areas contained a
note to the effect that the contractor would be allowed to
borrow from any permitted areas "only to the extent that
the materials are satisfactory for their intended use."   It
was provided in the contract that the engineer was to de-
termine whether materials were "satisfactory."   In the
studies of possible plans of operations to which bidders
were referred this was further emphasized, and it was
stated that "Preliminary investigations indicate a varia-
bility of materials in these areas and that mixing of mate-
rials obtained from various parts of the borrow areas will
be required although limited quantities of materials in some
parts may be found suitable for use without such mixing."
These statements indicated to a bidder that an undefined
and uncertain amount of mixing would probably be re-
quired, and that the requirements would be likely to ex-
tend beyond the confines of any one area.   The petitioner
was fully informed that if it bid on the assumption that it
could build the entire embankment from the lower area it
would do so at its own risk.   The undisclosed decision did
not forbid the use of that area.   It amounted to no more
than that "at least some considerable part" of the material
would have to come from other sources.   How much was
not decided.   The petitioner had been fully informed that
it was likely that part of the material would have to come
from other sources.   The petitioner must have known that
in any event the engineers would exercise their powers
under the contract to secure the material they wanted from
the places where nature had laid it.   If the petitioner had
known of the so called decision, it must also have known
that the decision was not irrevocable.   It might well still
have hoped that it could use the lower area alone if that
area proved satisfactory.   So far as this matter was con-
cerned hope was all the petitioner had to bid on whether
informed of the decision or not.   Moreover, the auditor
found that at the time of the bid the petitioner was tenta-
tively planning to use a hydraulic method of excavating
which at a given distance from the mixing chamber would

be no more expensive in the hard till of the upper area than in the modified drift of the lower area. The petitioner employed its own engineer with whom it investigated the site and with whose assistance it calculated its bid. The auditor finds that "it contemplated the possibility of excavating from the upper area also," and that, even after the contract was executed, it and its engineer "devoted much of their research and inquiry" to the question of what borrow area or areas should be used, and the petitioner even submitted its own preliminary lay-outs of its proposed sluicing plant showing arrangements for the borrowing of till from the upper area as well as of modified drift from the lower area. In these circumstances we think there is no preponderating proof that the petitioner would have declined to bid or would have altered its figures or would have been influenced in any material degree if the so called decision had been disclosed to it. See *Matthews* v. *Bliss*, 22 Pick. 48, 53; *Hartford Live Stock Ins. Co.* v. *Matthews*, 102 Mass. 221, 225; *Safford* v. *Grout*, 120 Mass. 20, 25; *Light* v. *Jacobs*, 183 Mass. 206, 210; *McGrath* v. *C. T. Sherer Co.* 291 Mass. 35, 58; Williston on Contracts (Rev. ed.) § 1515. There are facts pointing in each direction, and the burden of proof is upon the petitioner. *Exchange Realty Co.* v. *Bines*, 302 Mass. 93, 98. We incline to agree with the auditor that the element of actual reliance upon the nonexistence of the undisclosed decision as an inducement to enter into the contract is not established.

The petitioner also contends that there was nondisclosure of the decisions or intentions of the engineers in regard to the proposed locations of the edges of the pool as the work advanced, the breaking up of so called intrusions of coarse materials into the core, and the grain sizes of the materials to be placed in the core to secure imperviousness; but in respect to none of these matters are there findings of actual misrepresentation or of fraudulent nondisclosure and of reliance necessary to rescission. Am. Law Inst. Restatement: Contracts, §§ 470, 471, 476, Restitution, § 8. See Williston on Contracts (Rev. ed) § 1487. It was inevitable that the respondent's engineers would hold opinions or views as to

what they would require, or would probably require, under the contract. It is difficult to see how the so called decisions could have amounted to more than this. Mere failure to communicate these, without more, is not fraud justifying rescission, even though some of them might not accord with what from the general nature of the work, the plans, and the specifications the petitioner might reasonably have expected. *Phinney* v. *Friedman,* 224 Mass. 531. *Brockton Olympia Realty Co.* v. *Lee,* 266 Mass. 550, 561. See *Swinton* v. *Whitinsville·Savings Bank,* 311 Mass. 677. The petitioner was fully informed by the terms of the contract that it would have to perform it subject to the directions and to the satisfaction of the engineers, and that their orders given in good faith and not its own previous expectations, even if reasonable, would be the measure of its obligations.

3. The petitioner's next contention, that it can recover for breach of contract in the nature of breach of implied warranty, rests principally upon the facts that the plans showed, and the "Information for Bidders" and the body of the contract itself referred to, "permitted borrow" areas as expected from "present indications" and "preliminary investigations" to yield suitable materials; and that the contract suggested several "Plans of Operation," some of which indicated the use of the lower area, which was referred to in the construction "studies" as "probably suitable." But these references must be read in connection with other express statements on the plans and in the contract to the effect that the existence of a sufficiency of suitable material in any one area is not guaranteed; that the contractor will be allowed to borrow from any one area only to the extent that the materials are acceptable and satisfactory (which means acceptable and satisfactory to the engineer); that mixing of materials from different borrow areas will probably be required; and that whenever the character of the borrow pit materials is unsatisfactory (which means unsatisfactory to the engineer), the contractor shall change the location of his borrowing or mix with other materials. There are many provisions of similar import. Besides these, there are general provisions that

the engineer shall decide all questions as to the quality, acceptability, and fitness of the materials to be furnished, and that the entire work shall be completed to the satisfaction of the engineer. Reading the contract as a whole, we are unable to find in it any contractual assurance to the petitioner that it could construct the embankment exclusively from the lower area or that at some stage it might not be required to abandon that area altogether, or that the engineers had not already formed opinions on the subject. See *Franklin A. Snow Co.* v. *Commonwealth*, 303 Mass. 511, 515. As a matter of fact the petitioner was allowed to use the lower area for the greater part of its borrowing during about half of the period of construction. The absence of a contractual undertaking in this matter distinguishes the case from *Hollerbach* v. *United States*, 233 U. S. 165, *Christie* v. *United States*, 237 U. S. 234, *United States* v. *Spearin*, 248 U. S. 132, *Faber* v. *New York*, 222 N. Y. 255, and other cases cited by the petitioner. See *United States* v. *Atlantic Dredging Co.* 253 U. S. 1; *United States* v. *Smith*, 256 U. S. 11. Compare *MacArthur Brothers Co.* v. *United States*, 258 U. S. 6.

If the petitioner intends to make a further contention that widening of the sluicing limits can properly be described as a breach of warranty, that matter will be dealt with later in considering particular alleged breaches of contract.

4. We now come to the consideration of certain alleged specific breaches of contract of which the petitioner complains. As set forth in its brief, these are four in number. (1) Shortly after the work started the engineer ordered the sluicing limits to be set so wide that the thickness of the core of the embankment was increased beyond the "theoretical core line" (even as interpreted by the engineer) by an amount which does not exactly appear and which, owing to the unavoidable irregularity of the faces of the core and to the fact that they are buried in the shoulders, probably cannot be ascertained with any degree of accuracy. So far as the findings of the auditor go they indicate an average increase in thickness of the core of slightly less than ten

feet on each side of the median line of the embankment, although at some points and at some levels the increase was greater. (2) After the operations for the season of 1937 had ended and before operations in 1938 began the engineers decided to increase substantially the proportion of the finest materials in the core as compared to the proportion previously accepted in order to increase the imperviousness of the core. (3) In consequence of claimed breaches 1 and 2 just mentioned it became necessary to provide a larger proportion of the finest materials in the mixture sluiced, and this led to the refusal of the engineers to permit further borrowing from the lower area which they considered deficient in fines to meet the requirements. Thereafter the petitioner borrowed from the upper area which contained such an excess of fines as to require "wasting" at the petitioner's expense. The refusal to permit further borrowing from the lower area is the third breach claimed. (4) By the latter part of August, 1938, the excess of fines had resulted in building up the core so much more rapidly than the shoulders that, for the time being at least, it became very difficult to continue by the hydraulic method called for by the contract, and the engineers ordered the petitioner "temporarily" to suspend hydraulic operations and to borrow "a considerable amount" of coarse material from a location not described on the plans as a borrow area and located thirty-five hundred feet south of the dam. This material, together with some stones from the upper borrow area, was brought by trucks and spread dry upon the embankment. The amount of material so transported by truck does not appear. Thereafter hydraulic operations were resumed. The requirement of trucking and spreading the dry materials is the fourth breach claimed.

In passing upon these alleged breaches of contract by the respondent it becomes necessary first to determine whether the several orders of the engineers of which complaint is made lay within the scope of the very extensive powers which by the express terms of the contract both parties committed to the engineers. Pertinent provisions of the contract defining these powers are here quoted or summar-

ized. In the "Definitions" of the contract the word "core" was defined in part as the central portion of the dam formed by the settling of the finer particles in the pool "within the limits specified *or ordered*" (meaning ordered by the engineers. Italics are ours.) The engineers were empowered to make final decision of "all questions which . . . [might] arise as to the performance, quantity, quality, acceptability, fitness and rate of progress" of the work or materials and "as to the fulfillment of this contract on the part of the contractor." Details shown on the plans incorporated in the contract were to be subject to revision, alteration, modification, and variation, and such "revisions, alterations, modifications or variations in said plans as are desirable in the opinion of the engineer, on account of conditions encountered or for other reasons, shall not be considered a variation of the terms of this contract . . . ." The work contracted for included "placing all excavated materials in an approved manner in approved locations, and doing all incidental work in accordance with the terms of the contract and the requirements of the engineer." "The approval of any method is contingent upon the continued suitability of borrow pit materials," and the contractor "shall from time to time make such changes in method and in the conduct of the work as to insure at all times the delivery of acceptable materials." "The contractor . . . shall use such methods and appliances . . . as will secure a satisfactory quality of work and rate of progress." ("Satisfactory" is defined to mean "satisfactory to the engineer.") If such methods or appliances appear to the engineer to be inadequate for securing the quality of the work or the rate of progress he may order the contractor to increase their efficiency or to improve their quality. "In order to obtain a core of the dimensions and fineness desired . . . the engineer will at all times have complete control of the work even though his orders may at times interfere with the plans of the contractor . . . ." "To this end the engineer may modify the plan of operation or of construction if, in his judgment, such modification is necessary or desirable on account of the quality, safety or speed of the work." There

were express provisions that the contractor might be required to waste fines by pumping if the engineer should determine that an excessive quantity of fines retained in the pool interfered with construction. ". . . the contractor shall borrow, transport, place and control the proper separation, grading and consolidation of materials in that portion of the dam embankment to be constructed by the full-hydraulic method, as shown on the plans *or ordered*" (italic ours). To insure that the core and shoulders shall be of "satisfactory dimensions and quality" the contractor must maintain the required dimensions of the pool and "shall change the location of his mud lines and their point of discharge as ordered [by the engineer] from time to time and waste fines if required . . . ." "The entire operation of hydraulic fill shall be subject to the control of the engineer and in accordance with the approved plan of operation . . . ," which plan, however, might be modified by the engineer as hereinbefore stated. The core is to be "of satisfactory water-tightness." "The engineer may make alterations in the line, grade, plan, form, dimensions or materials of the work, or any part thereof, either before or after the commencement of construction." The provision last quoted appears in a separate article near the end of the contract, which also provided that where alterations increased the quantity of any item to be paid for at a unit price the increase should be paid for at that price.

Comprehensive as these powers are, they did not go so far as to authorize the engineers to do anything whatever that they might see fit. These powers are not so extensive as to enable the engineers to abrogate the contract which the parties executed; nor did their inclusion in the instrument prevent the creation of a contract in the first place. The purpose of such powers is to maintain control over the work as it progresses by the persons selected and to secure flexibility in adapting means to ends. The discretion committed to the engineers must be exercised within the framework of the original contract and for the purpose of carrying out the work originally intended. The engineers could not substitute for the earthen dam at the place specified a

masonry dam at some other point. Changes ordered may be important and in themselves substantial, but the parties must be deemed to have intended that when viewed against the background of the work described in the specifications as a whole they must be directed to furthering the original design and must not be destructive of that design or disproportionate in size or amount. *Gaffey* v. *United Shoe Machinery Co.* 202 Mass. 48, 53. *Dahlstrom Metallic Door Co.* v. *Evatt Construction Co.* 256 Mass. 404, 413. *Bay State Dredging & Contracting Co.* v. *South Essex Sewerage District,* 279 Mass. 158. *National Contracting Co.* v. *Hudson River Water Power Co.* 192 N. Y. 209. *Kinser Construction Co.* v. *State,* 204 N. Y. 381. *Wood* v. *Fort Wayne,* 119 U. S. 312. *Freund* v. *United States,* 260 U. S. 60. *Salt Lake City* v. *Smith,* 104 Fed. 457. *Drainage District No. 1 of Lincoln County, Nebraska* v. *Rude,* 21 Fed. (2d) 257. See *Morse* v. *Boston,* 253 Mass. 247; *National Contracting Co.* v. *Commonwealth,* 183 Mass. 89. Compare *Morgan* v. *Burlington,* 316 Mass. 413, 419–420.

In our opinion all of the orders and decisions of the engineers of which the petitioner complains were within the scope of the powers conferred upon them by the contract. A thickening of the core by a total amount which seems to have been less than twenty feet in an embankment of such immense size, even though it increased the volume of the core as much as twenty per cent, did not, in the circumstances shown, change the general character and identity of the work. This did not increase the width or volume of the whole embankment. It merely increased the bulk of the core at the expense of the shoulders. The number of cubic yards to be placed and paid for remained the same. The contract price per cubic yard was the same for core as for shoulders. The special references to the core hereinbefore quoted from the contract show that alterations in its dimensions by orders of the engineers were within the contemplation of the parties. The increase in the proportion of the finest materials in the core was likewise comprehended within a fair interpretation of the provisions already quoted. That related directly to the quality of

the materials and of the work, which must be satisfactory to the engineers. It was not in conflict with any provision of the specifications. The petitioner practically concedes that neither the widening of the core nor the increase in the proportion of the finest materials contained in it would have caused the petitioner any damage if those changes had not directly led to the third claimed breach, to wit, requiring the petitioner to cease borrowing from the lower area and to use another and more difficult area (also shown on the plans as a permitted borrow area) which contained a larger proportion of fines and the use of which ultimately made it necessary to waste fines — a process expensive to the petitioner. But we have already shown that the contract contained no guaranty that the petitioner could use any particular borrow area or areas, and that materials borrowed must at all times be satisfactory to the engineers. The embankment was not to be built to conform to the borrow pits. On the contrary all borrow pits used must conform to the requirements of the embankment, meaning the embankment as modified by any orders the engineers had power to give. The fourth breach claimed, ordering the temporary abandonment of the hydraulic method and the substitution of the trucking of dry material, might perhaps have amounted to a breach of contract if it had involved a vital change in the whole method of construction. But the findings do not ascribe to it any such importance or effect. So far as appears this operation may have lasted no more than a day and may have involved no more material than necessary to insure prompt correction of the then muddy condition of the beaches. The wasting of fines began the day after this order. The trucking of material to the embankment was not wholly foreign to the contract. The specifications contained provisions for the construction of the top portion of the embankment above the intended water line by this method and gave considerable discretion to the engineer as to when this should begin. We think that the order here in question is not shown to have been more than an incident of the work within the control of the engineer under provisions previously quoted.

Since it appears that the orders of the engineers were within the scope of powers granted to them as defined by the contract, the only remaining inquiry is whether they have actually exercised the judgment committed to them without compulsion, deception, or fraud on the part of others and in good faith on their own part. A wholly arbitrary or whimsical or irrational decision might indicate that there had been no true exercise of judgment upon the problems presented. So, too, if the engineers were misled "and so far misapprehended the case that . . . [they] failed to exercise . . . [their] judgment upon it." *Hurley v. Boston*, 244 Mass. 466, 471. But the findings are insufficient to prove that the decisions of the engineers were not valid and binding upon the petitioner. In several instances the auditor has found that their decisions were - unreasonable and unnecessary, but in an exhaustive report prepared with the greatest care he has refrained from going farther. It is obvious that his restraint was intentional. When he said unreasonable and unnecessary he meant no more than (in his opinion, formed from the evidence before him) not in accordance with, or demanded by, good engineering judgment. Many expressions in his report show that this is its true interpretation. There is no finding that any of the decisions complained of was arbitrary, capricious, or tainted by compulsion or fraud. Our examination of the subsidiary findings does not persuade us to go farther than the auditor went. We have carefully considered all points urged by the petitioner, and we do not conclude that the decisions complained of resulted from such misapprehension of basic facts as to show that the engineers failed to exercise their judgment upon the problems before them or that their decisions were arbitrary. The case must therefore be dealt with on the footing that all decisions of the engineers were made in the actual free exercise in good faith of their own best judgment. Neither reasonableness in the ordinary sense nor necessity determines the limits of the engineers' powers or the validity of their exercise. This is not a case where work is to be done to the satisfaction of a party to the contract and where the contract is

interpreted, if possible, to mean reasonable satisfaction. *Hawkins* v. *Graham*, 149 Mass. 284. Here the engineers, at least with respect to the decisions complained of, are made quasi arbitrators by whose judgment the parties agree in advance to be bound. *Hathaway* v. *Stone*, 215 Mass. 212, 215–216. Their decisions are not to be controlled by any extrinsic standard of reasonableness or necessity. That would merely substitute the judgment of court or jury for that of the engineers. The words reasonably or unreasonably or some equivalent have crept into a few of the decided cases beside other more appropriate words, [1] but a careful reading of the authorities will support the statement just made. [2] We do not understand that the petitioner argues to the contrary. The problems of the desirable degree of imperviousness of the core and of the thickness and the fineness of material required to produce that degree of imperviousness and where that material could be obtained in proper quantity and proportion were strictly engineering problems which under the contract were to be solved by the engineers. For a court to substitute its own lay opinions on such matters, however well it may think itself informed through evidence, for the opinions of the engineers in the field to whom the parties have entrusted such decisions would be directly contrary to the terms of the contract and in the long run likely to produce unsound results.

The order of the Superior Court denying the "Petitioner's Motion for Order on Auditor's Report" is affirmed.

---

[1] See, for example, *Chapman* v. *Lowell*, 4 Cush. 378; *Evans* v. *County of Middlesex*, 209 Mass. 474, 479, 480; *Dubinsky* v. *Wells Brothers Co. of New York*, 218 Mass. 232, 236; *Ripley* v. *United States*, 223 U. S. 695, 702.

[2] *Palmer* v. *Clark*, 106 Mass. 373, 389. *Flint* v. *Gibson*, 106 Mass. 391, 394–395. *Robbins* v. *Clark*, 129 Mass. 145. *Audette* v. *L'Union St. Joseph*, 178 Mass. 113, 115. *National Contracting Co.* v. *Commonwealth*, 183 Mass. 89, 92. *Norcross* v. *Wyman*, 187 Mass. 25. *White* v. *Abbott*, 188 Mass. 99. *Hebert* v. *Dewey*, 191 Mass. 403, 408, 414. *Loftus* v. *Jorjorian*, 194 Mass. 165, 169. *Handy* v. *Bliss*, 204 Mass. 513, 520. *Hathaway* v. *Stone*, 215 Mass. 212, 216. *Marsch* v. *Southern New England Railroad*, 230 Mass. 483, 493. *Hurley* v. *Boston*, 244 Mass. 466, 470–471. *Charles I. Hosmer, Inc.* v. *Commonwealth*, 302 Mass. 495, 503. *Coleman Bros. Corp.* v. *Commonwealth*, 307 Mass. 205, 216. *Morgan* v. *Burlington*, 316 Mass. 413, 419–420. *Martinsburg & Potomac Railroad* v. *March*, 114 U. S. 549. *United States* v. *Gleason*, 175 U. S. 588, 602. *Coltra* v. *Weeks*, 271 U. S. 536, 548. Williston on Contracts, (Rev. ed.) § 797.

The orders allowing the "Respondent's Motion for Judgment on Claims Two and Four of the Petition" and the "Respondent's Motion for Final Decision on Claims One and Three of the Petition," in view of the judge's statements in his findings, rulings and order, are interpreted as intended only to govern the disposition by the court of the several claims of the petition and not as necessarily adopting all of the propositions contained in the numbered paragraphs of these motions, with some of which propositions the judge stated that he deemed it unnecessary to deal. So interpreted, these orders also are affirmed.

*So ordered.*