CRAIG V. SAMUELS & another [1] vs. STEVEN L.
BROOKS & another. [2]

No. 87-504.

Plymouth. January 8, 1988. — February 26, 1988.

Present: GRANT, DREBEN, & FINE, JJ.

*Lead Poisoning Prevention. Real Property,* Purchase and sale agreement.
*Contract,* Sale of real estate, Performance and breach, Damages.

In an action by the prospective buyers of residential property against the
    sellers for specific performance of the purchase and sale agreement,
    which the buyers interpreted to require conveyance of the residence free
    of any lead paint contamination and which was entered into after G. L.
    c. 111, §§ 190-199, the lead paint statute, took effect in 1971 but prior
    to the effective date of St. 1987, c. 773, § 9, amending G. L. c. 111,
    §§ 197-199, the judge correctly allowed the sellers' motion for summary
    judgment, where the terms of the parties' agreement with respect to the
    condition of the premises indicated that any right of the buyers to avoid
    accepting the premises with dangerous levels of lead paint depended
    upon the timely exercise of their right to inspect the premises and "re-
    voke" the agreement if reasonably unsatisfied with the results, and that,
    otherwise, they were bound to take delivery of the premises "in the
    same condition" as they were at the time of the agreement; where there
    was no indication that the buyers exercised their right to an inspection;
    and where the lead paint statute, as in effect at the time of this agreement,
    contained nothing that could be read into the agreement to require a
    different result. [425-427]
Prospective buyers of certain residential property, having refused, without
    proper basis, to tender the purchase price at the time provided in the
    purchase and sale agreement, were not entitled to summary judgment
    on their claim for return of their $2,000 deposit, on the theory either
    that the sellers' conduct toward them had been inequitable or that the
    agreement lacked mutual assent insofar as it related to the parties' obli-
    gations under the lead paint statute. [427-429]
In an action arising out of an intended sale of residential property in which the
    buyers, having refused, without proper basis, to tender the purchase price

[1] Edwina G. Samuels.

[2] Karen E. Brooks.

at the agreed time, were in breach of the purchase and sale agreement,
the sellers were precluded from recovering compensatory damages ex-
ceeding the amount of the deposit, where the agreement provided that,
in the event of a breach by the buyers, the deposit "shall be retained
. . . as liquidated damages unless within thirty days after the time for
performance . . . the seller otherwise notifies the buyer in writing," and
where, in proceedings for summary judgment, there was no showing
that such notice had been given. [429]


CIVIL ACTION commenced in the Superior Court Department
on November 17, 1986.

The case was heard by *Guy Volterra*, J., on a motion for
summary judgment.

*Robert J. Annese* for the plaintiffs.

*Robert S. Creedon, Jr.* (*Thomas G. Brophy* with him) for
the defendants.

FINE, J.  A recent amendment of the lead paint statute[3] deals
at length with the respective obligations of the buyers and
sellers of residential real estate with regard to detection and
removal of lead paint. This case, however, raises questions
regarding the sale of single-family residential property pursuant
to a standard form purchase and sale agreement which was
entered into after the lead paint statute first took effect in 1971
but prior to July 1, 1988, when the recent amendment is to be
implemented. Both the buyers and the sellers had children
under six years of age, and the parties did not engage in any
discussion or negotiations regarding lead paint before executing
the agreement.

Craig V. and Edwina G. Samuels, the prospective buyers,
brought an action for specific performance of the purchase and
sale agreement, which they interpreted to require the sellers,
Steven L. and Karen E. Brooks, to convey the property free
of lead paint. A copy of the purchase and sale agreement was
appended to the complaint. The sellers filed an answer denying
that the premises contained lead paint or that the purchase and
sale agreement placed any obligation on them to remove lead

---

[3] Statute 1987, c. 773, § 9, amending G. L. c. 111, §§ 197-199. The
entire lead paint statute may be found at G. L. c. 111, §§ 190-199.

paint, if any was present on the premises. The sellers also filed a counterclaim seeking damages for the buyers' breach of contract. The defendant sellers moved for summary judgment, supporting their motion with their joint affidavit and an affidavit from their real estate broker. The plaintiff buyers filed their joint affidavit in opposition. The opposing affidavits are not in dispute as to what occurred, which was the following.

The sellers owned a single-family home in Brockton in which they resided with their child, who was under six years of age. On April 19, 1986, represented by a broker, they and the buyers signed a "standard form"[4] purchase and sale agreement. That agreement provided for a purchase price of $140,000, later reduced by agreement to $135,000. It set forth terms usually found in such agreements, including, among others, terms relating to a mortgage contingency, the time (which was "of the essence") for performance, and the buyers' right to inspect. The following provision was also included:

> 29. *Lead Paint Law.*
>
> "The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age."

There were several written extensions of the performance date because the buyers experienced difficulties in arranging financing. Finally, the parties orally agreed to a closing date of October 30, 1986. The sellers arrived at the appointed hour and place, but the buyers did not. Later the same day, the buyers did meet with the broker and the attorney for the financial institution prepared to provide the buyers' financing, who

---

[4] Portions of the form used were taken from the 1984 version of the Greater Boston Real Estate Board form.

had been authorized to close the transaction on the sellers' behalf. The attorney for the buyers' financial institution presented the buyers with a copy of G. L. c. 111, § 197 (prior to its amendment), a section of the lead paint statute, and requested that they sign a document acknowledging that they had received notice of it; the buyers refused to sign the document and left.[5] The buyers stated in their affidavit that the sellers "have refused and continue to refuse to remove the dangerous levels of lead paint present in the subject property."

The judge allowed the sellers' motion for summary judgment on the complaint for specific performance. He viewed the buyers' reliance on the paragraph in the purchase and sale agreement referring to the lead paint law as unfounded. He ordered the return of the buyers' $2,000 deposit, however, reasoning that the sellers had acted inequitably in including in the purchase and sale agreement only part of the relevant language of G. L. c. 111, § 197, as inserted by St. 1971, c. 1081, § 1. Although the first sentence of the relevant part of that section was quoted in paragraph 29 of the agreement, the full text of the relevant part of the statute was as follows:

> "Whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible materials contain dangerous levels of lead as defined pursuant to section one hundred and ninety-four, the owner shall remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age. Whenever any such residential premises containing said dangerous levels of lead undergoes a change of ownership and as a result thereof, a child or children under six years of age will become a resident therein, the new owner shall remove or cover said paint, plaster or other material so as to make it inaccessible to such children."

---

[5] This last portion of the factual account comes not from any of the affidavits but from the judge's memorandum of decision and from both the sellers' and buyers' appellate briefs.

The judge concluded that "fairness would have dictated that the [sellers] and the real estate agent should have early on candidly informed the [buyers] that if they purchased the real estate they would be responsible under the law for deleading the premises." Instead, he said, they "opt[ed] for springing the lead law upon the [buyers] at the closing." Thus, he ordered the return of the deposit, and he ordered the sellers' counterclaim for damages dismissed. All parties appealed.

We agree with the judge that the buyers were not entitled to specific performance of an alleged agreement to convey the residence free of any lead paint contamination. We disagree that the sellers acted inequitably. We therefore vacate the order for the return of the $2,000 deposit. We agree with the judge, however, that the sellers' counterclaim should have been dismissed.

1. *The buyers' claim for specific performance.* To determine whether the sellers obligated themselves in the purchase and sale agreement to convey the subject property free of any lead paint contamination, we look first to the terms of the parties' agreement with respect to the condition of the premises. The written agreement contains three paragraphs which must be examined. According to paragraph thirty, the buyers had the right at their own expense to have the property inspected for defects and, based upon the results of the inspection, on or before April 30, 1986, to revoke the agreement and have their deposit returned. There is no indication that the buyers exercised their right under paragraph thirty to an inspection. In addition, paragraph nine provides for delivery of the premises "in the same condition as they now are, reasonable use and wear thereof excepted . . . [but] not in violation of . . . building and zoning laws . . . [B]uyer shall be entitled to an inspection of said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause." A lead paint violation is enforceable as a violation of the State sanitary code. G. L. c. 111, § 198. Paragraph nine, therefore, does not, by its terms, apply to such a violation. In any event, there is no indication the buyers ever attempted to exercise any rights under paragraph nine.

We come then to the terms of paragraph twenty-nine, already recited, dealing with the lead paint law. That paragraph is expressed in terms of "acknowledg[ment]" of the parties. We think it is no more than an acknowledgment by all parties that they were aware of the requirement of the law: that an owner, whoever he may be at any particular time, is under a legal obligation to remove lead paint if children under six reside in the premises. We note the use of the word "owner," in paragraph twenty-nine, not "seller," the term used throughout the agreement to refer to the defendant sellers. Thus, paragraph twenty-nine, in our view, cannot reasonably be construed as a representation either that the property was lead-free or that the sellers would undertake to inspect for the presence of lead paint and to remove any lead paint found. Any right the buyers might have had under the agreement to avoid accepting the premises with dangerous levels of lead paint depended upon the timely exercise of their right under paragraph thirty to inspect the premises and "revoke" the agreement if reasonably unsatisfied with the results. Otherwise, they were bound to take delivery of the premises "in the same condition" as they were at the time of the agreement.

There is nothing in the lead paint law, as it existed at the time of this agreement, which could be read into the agreement to require a different result. Although under G. L. c. 111, § 197, any owner living in the property with a child under six had a duty to remove any dangerous lead paint, the statute did not deal with or add to the respective obligations of buyers and sellers of the real estate with respect to lead paint. By contrast, the recent amendment of the lead paint statute does deal with those obligations in great detail,[6] as does an analogous

---

[6] General Laws c. 111, § 197A, inserted by St. 1987, c. 773, § 9, provides, in relevant parts, as follows:

"Prospective purchasers of residential premises constructed prior to nineteen hundred and seventy-eight shall be notified about the hazards of lead in paint, plaster, soil and other material in residential premises and the requirements for their removal or covering as follows:

"(a) The director [of the childhood lead poisoning prevention program] shall, by July first, nineteen hundred and eighty-eight, prepare a

statute relating to the existence of urea formaldehyde foam insulation in residences.[7]

2. *The Buyers' Right to the Return of Their Deposit.* The buyers, having refused, without proper basis, to tender the purchase price at the agreed time, were in breach of the purchase and sale agreement. Nevertheless, the judge ordered the return

---

standard notification form and such other materials as may be necessary to inform prospective purchasers about: the possible presence of dangerous levels of lead in such premises, the symptoms and treatment of lead poisoning, and the requirements of the lead law and regulations, including the provisions concerning liability for failure to abate lead hazards . . . .

"(b) Effective July first, nineteen hundred and eighty-eight, all persons selling residential premises constructed prior to nineteen hundred and seventy-eight shall, prior to the signing of a purchase and sale agreement, provide a copy of the form and other materials prepared pursuant to subsection (a) to the prospective purchaser. . . . [S]uch seller and any real estate agent involved in the sale shall disclose to the prospective purchaser any information known to the seller or real estate agent about the presence of paint, plaster, soil or other materials containing dangerous levels of lead in the residential premises.

"(1) The prospective purchaser shall also be informed by the seller and any such real estate agent about the availability of inspections for dangerous levels of lead. If, after receiving said notice, the prospective purchaser chooses to have an inspection done, the seller shall afford the prospective purchaser a period of ten days or such longer time as the seller and purchaser may agree to have such inspection performed, either through a lead inspection contingency in the purchase and sale agreement or otherwise.

"(2) If any real estate agent involved in the sale has provided the prospective purchaser with the required information and materials, they shall verbally inform the prospective purchaser of the possible presence of dangerous levels of lead and the provisions of the lead law and regulations."

[7] General Laws c. 255, § 12I, as appearing in St. 1986, c. 557, § 183, provides, in relevant part, as follows:

"Any person offering for sale a residential dwelling insulated with urea formaldehyde foam insulation, hereinafter called UFFI, shall determine whether UFFI is in the dwelling and, if it is, shall have the dwelling tested for formaldehyde gas and shall make the following disclosure to any prospective purchaser: (1) where such UFFI is located within the building, and, if known, when it was installed; (2) a copy of the test results; and (3) a copy of information developed by the department of public health concerning formaldehyde levels in dwellings insulated with UFFI and dwellings not insulated with UFFI."

of the deposit because he viewed the sellers' conduct as inequitable. We discern no such inequity. There was nothing in the fuller text of the statute which should have surprised the buyers. The language in the portion of the statute appearing in the purchase and sale agreement informed the buyers of the obligations they would have had under the statute as new owners of residential property in which children under six would be residing. The omitted sentence regarding change of ownership merely restated what was inherent in the first sentence — that any owner at any time who has a child under six living on the premises has the stated obligation.

Nor have the plaintiff buyers shown that they might be entitled to the return of their deposit on the theory that there was no mutual assent between them and the sellers as to an important term of the agreement, the respective obligations of the parties with regard to any potential lead paint problem. A contract may be held to be nonexistent for failure of mutual assent if the parties attach conflicting and irreconcilable meanings to a material term of the contract. See Restatement (Second) of Contracts § 20 (1981). It is true that the parties here disagree as to the correct interpretation of the purchase and sale agreement they signed with respect to any potential lead paint problem. Having signed a comprehensive and detailed written agreement for the transfer of specified real estate for a stated price, however, the plaintiffs have a difficult task in proving that there was no mutual assent between the parties. "The fact that an executed written contract contains within itself difficulties of construction about which the parties disagree does not enable a party to contend that the minds never met." *Bucciero* v. *Drinkwater*, 13 Mass. App. Ct. 551, 554 (1982), quoting from *Benjamin Foster Co.* v. *Commonwealth*, 318 Mass. 190, 196 (1945). We would be reluctant to declare an agreement a nullity because of the parties' disagreement over the interpretation of one provision unless that provision went to the heart of the agreement. That is not the case here. The buyers have not even made a showing that there was lead paint on the premises or, if so, how extensive the problem was. Without an admission by the sellers or an opinion from

an expert, the buyers have not satisfied their burden of showing the presence of a dangerous level of lead paint which would be costly to remove. All they assert in their affidavit is that the sellers refused to remove the "dangerous levels of lead paint." That statement may be disregarded for purposes of the summary judgment motion because such assertions by the affiants would not be admissible in evidence and the affidavit does not "show affirmatively that the affiant[s are] competent to testify to the matters stated therein." Mass. R. Civ. P. 56(e). See *Madsen* v. *Erwin*, 395 Mass. 715, 719 (1985).

3. *The Sellers' Counterclaim for Damages.* In their counterclaim, the sellers allege that the breach of the agreement by the buyers entitles the sellers to substantial compensatory damages beyond the $2,000 deposit they hold. Paragraph twenty-two of the agreement provides, however, that in the event of a breach by the buyers, the deposit "shall be retained . . . as liquidated damages unless within thirty days after the time for performance . . . or any extension [t]hereof, the seller otherwise notifies the buyer in writing." There was no showing of any such notice in writing or otherwise.

The portion of the judgment ordering the defendants to return the $2,000 deposit to the plaintiffs is vacated. Otherwise, the judgment is affirmed.

*So ordered.*