339 Mass. 356 (1959)
159 N.E.2d 95
FRED C. McCLEAN HEATING SUPPLIES, INC.
vs.
JEFFERSON CONSTRUCTION CO. & others.[1]
Supreme Judicial Court of Massachusetts, Suffolk.
April 8, 1959.
June 8, 1959.
Present: WILKINS, C.J., WILLIAMS, COUNIHAN, WHITTEMORE, & CUTTER, JJ.
Edward C. Park; (Morris Sokolove with him,) for Jefferson Construction Co.
Charles V. Ryan, for the plaintiff.
CUTTER, J.
This is a bill in equity brought by a subcontractor to establish a lien (see G.L.c. 30, § 39, as amended through St. 1935, c. 472, § 1[2]) for amounts not paid under its subcontract (a) upon money retained by the Commonwealth from amounts owing to the prime contractor, Jefferson Construction Co. (hereinafter called Jefferson), for construction at a teachers college, and (b) against a bond, executed by Jefferson and a surety company, to secure payments for work and materials. The case was referred to a master. Two exceptions (later mentioned) to the master's report were sustained and, as thus modified, the report was confirmed by interlocutory decree. A final decree was entered adjudging Jefferson to be indebted to the subcontractor in the sum of $17,513.45 with interest and costs and directing that this sum, if not paid by Jefferson, be paid out of funds retained by the Commonwealth from the contract price or, in the alternative, by the surety on the bond. A counterclaim by Jefferson (for amounts alleged to have been spent by Jefferson for the account of the subcontractor) was dismissed. Jefferson has appealed from the interlocutory decree and the final decree. The facts are stated on the basis of the master's report.
On September 10, 1954, Jefferson made a written proposal for construction for the Commonwealth at the State Teachers' College at Westfield. In this proposal the subcontractor was named as subbidder for heating and ventilating under § 24. The subcontractor had previously submitted a bid "to furnish all labor and materials for the completion of all work under the subheading `Heating and *358 Ventilating' Item H-V, pages 24-1 to 39 inclusive, in accordance with the plans and specifications prepared by Abbott Associates, Inc." Jefferson was successful bidder for the building construction and the subcontractor's bid for the heating and ventilating was approved.
On September 24, 1954, Jefferson executed a prime contract with the Commonwealth for the building construction and, shortly thereafter, the subcontractor entered into a subcontract on a standard form (American Institute of Architects) "to furnish labor, materials, tools, equipment, staging and do all heating and ventilating work as called for under, but not limited to [s]ection 24, [p]ages 24-1 thru 24-39 of the contract specifications." Pertinent provisions of these and other specifications not later quoted in full in this opinion are set out in the margin.[3] From this subcontract, *359 contract, after it was signed by the subcontractor, Jefferson struck out the words "That there will be no temporary heat included" and returned to the subcontractor the contract signed, but thus altered. The subcontractor accepted the subcontract with the deletion.
Early in November, 1955, Jefferson notified the subcontractor that it was necessary that the permanent heating system be made available. Such heat was available, at the latest, by November 17, 1955. The subcontractor, however, apparently did not make arrangements to operate the heating system after 4:30 P.M. on that day. Jefferson notified the subcontractor that it was "putting engineers on this heating system as of 4:30 P.M., November 17, and all costs in connection therewith will be charged against your contract due to your refusal to man the heating system." Jefferson on November 17 also wrote to the subcontractor's attorney that Jefferson agreed "that the cost of fuel is to be borne by the general contractor" but later attempted to withdraw this statement, as in effect an offer of compromise, by a letter of January 15, 1957.
From November 17, 1955, through May 4, 1956, to provide essential heat, Jefferson retained firemen to operate the permanent heating system and furnished the necessary oil. Although the subcontract provided that Jefferson would "perform no work chargeable to the [s]ubcontractor without a written order from the" latter, the master found that a request for such an order would have been useless in view of the subcontractor's contention that it was not obligated to provide labor and oil for operating the permanent heating system.
On May 31, 1956, Jefferson sent the subcontractor a bill for $11,772.29 for labor of firemen on the heating system *360 and, on November 21, 1956, many months after temporary heating had ended, a bill for $7,942.55 for oil. These charges the master found to be fair and reasonable. The subcontractor, however, prior to receipt of the later bill had no knowledge that Jefferson intended to hold it liable for oil.
The prime contract (art. III) between Jefferson and the Commonwealth contained a provision that the architect "shall decide all questions which may arise as to the quantity, quality, acceptability, fitness and rate of progress of the several kinds of work and materials to be performed and furnished under this contract, and shall decide all questions ... as to the interpretation of the plans and specifications and as to the fulfillment of this contract on the part of the Contractor,[4] and his ... decision shall be final ... except as may be otherwise determined by the Division; and such ... decision, in case any question shall arise, shall be a condition precedent to the right of the Contractor to receive any money hereunder" (emphasis supplied).
On January 11, 1957, the architect wrote to Jefferson purporting to give "our interpretation of the specifications ... namely, that (1) temporary heat, not using the permanent heating system is to be provided and cared for in its entirety by the General Contractor, and (2) temporary heat which uses the permanent heating system must be provided and cared for in its entirety by the heating subcontractor." The master admitted this letter in evidence over the subcontractor's objection. He also admitted, subject to objection, a letter of February 14, 1957, to Jefferson from the Commonwealth's director of building construction expressing the "opinion of this [d]ivision that the architects [sic] interpretation of the specifications ... is correct." Between the dates of these letters representatives of the interested parties and the architect were given a hearing before the division of building construction. The *361 subcontractor's exceptions to the master's report, based upon the objections to the admission of these two letters, were the two exceptions, already mentioned, which were sustained by the trial judge.
On January 15, 1957, Jefferson notified the subcontractor of four obviously trivial "discrepancies" in the subcontractor's work. These were corrected by January 25. The Commonwealth had "formally accepted the ... [p]roject ... on November 15, 1956, as of November 14, 1956." The master, apparently relying on the correction of the alleged "discrepancies," found that on "January 25, 1957, the ... [subcontractor] ceased to perform labor and to furnish materials, appliances and equipment on said job and, on February 15, 1957, it filed a sworn statement of its claim with the [d]ivision ... showing a balance due it of $17,513.45." This amount the master found to be correct if the subcontractor "was not required to operate the permanent heating system for furnishing temporary heat ... from November 17, 1955, to May 4, 1956." The master found further (a) that if the subcontractor was obligated to operate the heating system during that period, and also to supply the oil, then Jefferson was entitled to recover on its counterclaim for the cost of heating, labor and fuel $2,201.39 (net above the subcontractor's claim for $17,513.45), and (b) that, if the subcontractor was required to operate the system but not to furnish the oil, then the excess of the amount of the balance claimed by the subcontractor over Jefferson's labor cost of operating the heating system was $5,741.16. The question of the extent of the subcontractor's obligation with respect to supplying temporary heat the master left "as a question of law for the court ... under the contract entered into by said parties and on the facts found."
The master found "that the [a]rchitect acted in good faith [in] making said determination ... of January 11, 1957." The trial judge overruled the subcontractor's third exception to the report to the effect that it was not open to the master to make this finding.
*362 Jefferson now contends (a) that the subcontractor was bound by the subcontract to provide the temporary heat to be supplied by the heating system and (b) that the trial judge should also have overruled the exceptions to the report based upon the admission of the two letters (of January 11, and February 14, 1957) relating to the architect's decision. This decision, Jefferson contends, was binding upon the subcontractor. The subcontractor argues that art. III of the prime contract, stating the scope and effect of the architect's power of decision, was never binding upon the subcontractor, and that, if art. III ever was binding upon the subcontractor, the architect's power under it had long since expired.
1. Under § 5 (a) of the subcontract the subcontractor agreed to be bound to Jefferson by the terms of the prime contract, general conditions, drawings, and specifications, and to assume toward it all the obligations and responsibilities that Jefferson by those documents assumes toward the Commonwealth. The language of the subcontract defining the scope of the work varied slightly from that of the bid, but the price named in the subcontract was that named in the bid. This subcontract was prepared on the American Institute of Architects' printed form of subcontract which was intended primarily for use with a somewhat different form of prime contract than that here involved. See Parker and Adams, The A.I.A. Standard Contract Forms and the Law, pp. 52-54, 58. Under the circumstances here presented, its reasonable interpretation is that the subcontractor was binding itself to do only precisely the work on which it had bid. If the parties intended that the subcontractor should do more, they would have been arranging for performance by the subcontractor, at no additional compensation beyond that stated in its bid, of some of the work which Jefferson was itself bound to furnish under its bid accepted by the Commonwealth. Serious doubts might exist about the validity of such an unapproved delegation of work. See Gifford v. Commissioner of Pub. Health, 328 Mass. 608, 615, and other cases cited in Poorvu *363 Constr. Co. Inc. v. Nelson Elec. Co. Inc. 335 Mass. 545, 548, 552-554.
It is not significant that Jefferson struck out of the subcontract the exemption from any obligation to provide temporary heat before returning it to the subcontractor. The latter's bid fixed its obligation and its acceptance of the deletion is reasonably explained by its probable willingness to let the specifications speak for themselves.
The subcontract does incorporate the specifications by reference. One specification was § 24-01, reading, "(a) Attention is directed to the printed form of contract and [s]ection 1 of these specifications entitled `Supplementary General Conditions' which are ... made a part of this section of the specifications." Article III appeared in the contract thus incorporated by reference. We assume that art. III, so far as reasonably applicable by its terms to the subcontract and the subcontractor, became binding upon the subcontractor, if not because of § 5 (a) of the subcontract mentioned above, then because of the somewhat similar language on the back of the bid form and because of § 24-01 of the specifications. See United States v. United Enterprises, Inc. 226 F.2d 359, 361 (5th Cir.); Hudson, Building Contracts (7th ed.) 121.
2. We consider next whether the architect's power to act under art. III expired upon the final acceptance of the project, except perhaps (a matter we need not decide) with respect to disputes then pending before him or raised under obligations of the parties which might have to be performed after final acceptance. Article III contains a provision frequently found in construction contracts. See G.L. Rugo & Sons, Inc. v. Lexington, 338 Mass. 746, 749-751, and cases cited; Williston, Contracts (Rev. ed.) §§ 794-798; Corbin, Contracts, §§ 648-652. Its purpose was obviously to provide "a simple and convenient method for the settlement of any questions that, as the work proceeded, might arise over the interpretation of [at least] the ... drawings and specifications" (emphasis supplied). See Norcross v. Wyman, 187 Mass. 25, 27, where the particular contract article considered *364 (see p. 26) gave to the architect power of a binding "decision upon all questions relative to drawings, specifications or contract" (emphasis supplied). Cf. in the present case the provisions of art. III which dealt with "all questions ... as to the quantity, quality, acceptability, fitness and rate of progress ... and as to the fulfillment of this contract on the part of the [c]ontractor." Substantially the same provision found in art. III was considered in Benjamin Foster Co. v. Commonwealth, 318 Mass. 190, 196, 204 (and see original record in that case, p. 91). As to the powers given to the engineer in that case, this court said (at page 205), "Comprehensive as these powers are, they did not go so far as to authorize the engineers to do anything whatever that they might see fit. These powers are not so extensive as to enable the engineers to abrogate the contract which the parties executed; nor did their inclusion in the instrument prevent the creation of a contract in the first place. The purpose of such powers is to maintain control over the work as it progresses by the persons selected and to secure flexibility in adapting means to ends. The discretion committed to the engineers must be exercised within the framework of the original contract and for the purpose of carrying out the work originally intended" (emphasis supplied). See also the language in Handy v. Bliss, 204 Mass. 513, 520, referring to the architect's power "to determine practical questions of construction that arise under the plans and specifications in the execution of the work" (emphasis supplied), and in Morgan v. Burlington, 316 Mass. 413, 420, to the effect that "[t]he power to interpret the contract did not give ... [the architect] power to make a new contract for the parties or to eliminate or abrogate any of its terms." In Derby Desk Co. v. Conners Bros. Constr. Co. 204 Mass. 461, 464, this court considered an agreement that the architects' "decision as to the true construction and meaning of the drawings and specifications shall be final." It was said (at pp. 467-468) that a certificate of the architects as to their decision was properly excluded and that, in "the adjustment of differences, as the work progressed, the decision of the *365 architects as to the quantity and quality of the work within the true meaning of the drawings and specifications was to be final. But they were not empowered to act as arbitrators whose decision as to the interpretation of the contract, made nearly a year after the date of the writ, should be a condition precedent to the right ... to bring suit" (emphasis supplied). In White v. Abbott, 188 Mass. 99, 101-103, this court treated as conclusive an architect's certificate, given after the completion of certain masonry work, which a subcontractor had agreed to do but which the prime contractor had been forced to complete for the account of the subcontractor. There, however, the subcontract clearly contemplated that the architect, after the work had been completed, would audit the costs which the prime contractor was thus forced to assume and that the architect's certificate as to these costs should be final. The explicit grant of this power to the architect makes that case distinguishable from the situation here presented.
It is necessary to consider, in the light of these decisions, the circumstances (a) that no decision was requested of the architect when the dispute arose in November, 1955, and (b) that no decision was made by the architect until January 11, 1957, long after the acceptance of the project by the Commonwealth on November 14, 1956. In this consideration provisions, not heretofore mentioned, of the prime contract may be pertinent. The contract (art. XXIV, p. 36, under the heading "Inspection, etc. no waiver. As to remedies by the Commonwealth") provided, "Neither the inspection of the [d]ivision, its [a]rchitect ... nor acceptance of, the whole or any part of the work by them, or any of them, ... shall operate as a waiver of any provision of this contract or of any power herein reserved to the [d]ivision or its [a]rchitect." This provision (art. XXIV) presumably referred in large measure to art. XXV, which provided that, if "during ... one ... year from ... the final completion of the work ... as determined by the [a]rchitect, any part of such work shall in the opinion of the [a]rchitect require replacing or repairing ... the [a]rchitect *366 may notify the [c]ontractor ... to make the required repairs or replacement." Article XXIV may also have referred to art. XXIII, which (among other things) provided for a final computation of the value of the work "as soon as practicable after the completion of this contract" (in which all "prior partial ... payments shall be subject to correction and revision") and for a final payment to the contractor of this amount less one per cent to be retained and paid to the contractor "one year after the date of final acceptance of the work," after deducting all payments made under art. XXV for repairs and replacements.
All of these provisions indicate that some powers remain in the architect after work has been completed. See Hudson, Building Contracts (7th ed.) 36. Their language, however, falls far short of a clear and explicit requirement that the subcontractor submit all questions arising at any time with respect to the prime contract or the subcontract to the decision of the architect as an arbitrator. Cf. Maxwell Shapiro Woolen Co. Inc. v. Amerotron Corp., ante, 252, 254. Such agreements should not lightly be implied or extended beyond their reasonable import. Such consent to submit matters to the architect as the subcontractor gave by his bid and by § 5 (a) of the subcontract most reasonably is to be interpreted as limited (see, however, footnote 5, infra) to the period prior to the formal acceptance of the project containing the work which the subcontractor had agreed to do, or the acceptance of such work, whichever first occurs. The necessity for art. III arose from the necessity of final decision on matters within its scope in order to keep the project going during the period of construction. That necessity ceased when the project was finally accepted. Although the decisions already cited, other than the Derby Desk Co. case (204 Mass. 461, 467-468), do not deal with this question very directly, the general principles of those cases, in the absence of much more explicit language than appears in art. III, lead us to interpret art. III as having no application, after the final acceptance of the project, to issues like those disclosed affecting the subcontractor, which *367 could have been presented to the architect promptly but were never presented to him prior to such acceptance.[5]
We attach no importance to the letter written by Jefferson on January 15, 1957, shortly after the architect's letter of January 11, 1957, requiring the subcontractor to repair minor discrepancies having no relation whatsoever to temporary heating. We thus need not speculate whether it was merely a belated effort by Jefferson to make it appear that art. III was still generally applicable to the subcontractor (and not solely to his work repairing deficiencies) because the latter was still at work on the project, even though the project had finally been accepted.
3. In interpreting the ambiguous specifications (see footnote 3, supra) §§ 1-15 and 24 must be considered. Section 1-15, viewed by itself, suggests strongly that Jefferson was intended to furnish all temporary heat. Clause (a) of § 1-15 definitely states that "the [c]ontractor shall provide temporary heating" and all "apparatus ... fuel, ... electricity, attendance, ... and other items." Under clause (b) the "permanent heating system shall be used for drying out the building. Any other method ... must be entirely furnished by the [g]eneral [c]ontractor" (emphasis supplied). The word "entirely" implies that, apart from giving Jefferson authority to use the heating system supplied by the subcontractor, Jefferson is to be wholly responsible. The only suggestion in § 1-15 that the subcontractor has any obligations rests upon the last sentence of clause (b) which says, "Where the permanent heating system is used for drying out the building, the operation of the valve and of the system shall be furnished under Section 24, Heating and Ventilating, as therein specified." This cross reference is ambiguous, however, for § 24 does not clearly place the *368 burden of the "operation of the valve and of the system" on the subcontractor, as is indicated below.
Section 24-02 defining the scope of the heating and ventilating work refers to the work as if it consisted primarily of furnishing and installing equipment. Section 24-03 directly deals with temporary heat. Clause (a) of § 24-03 does no more than to require that the permanent system shall be available and shall be employed for drying out the building. Clause (b), in precisely the language of § 1-15 (c), referred to in footnote 3, states the temperature at which the heat shall be maintained after the building has been enclosed for drying out, but does not explicitly state whether the subcontractor or Jefferson is to maintain the heat. Clause (c), although not altogether free from uncertainty, seems merely to require the subcontractor to put the permanent system into first class condition after it has been used for temporary heating and before final acceptance. Clause (d) specifically requires certain testing of the permanent system to be done by the subcontractor and that it make the several portions of the system "available for temporary heat when required." If the intention was to make the subcontractor responsible for operating the system for temporary heat, it would have been natural to provide expressly that the subcontractor was to be responsible for this. We find nothing in § 24-03 to suggest any obligation on the part of the subcontractor to provide temporary heat except the circumstance that § 24-03 (b) is contained in § 24 of the specifications and states that heat "shall ... be maintained" once the "building ... has been enclosed." It can be argued that the subcontractor's bid "to furnish all labor and materials for the completion of all work under ... Item H V pages 24-1 to 39 ... in accordance with the ... specifications" (emphasis supplied) included this obligation listed in § 24-03 (b) but the provision of clause (b) is certainly blind in this respect and it would seem more reasonable to construe clause (b) as merely defining the heating capability (see Biggs v. Densmore, 323 Mass. 106, 108) to be required of the permanent system during the period of temporary *369 heating. Even reading § 1-15 and § 24 together, little appears to suggest any cutting down of the broad obligation of Jefferson to "provide temporary heating" contained in § 1-15 (a). We so construe the specifications. No proof of any business custom as to temporary heat appears to have been made and the parties have not directed our attention to any decided cases discussing this matter. See, however, Bloom, South & Gurney, Inc. v. Mitchell, 289 Mass. 376, 377-378; Parker and Adams, The A.I.A. Standard Contract Forms and the Law, 53-54.
4. Since the architect's decision is not binding here and in the light of the interpretation of the specifications which has been made, there was no error in the action of the trial judge. The interlocutory decree and the final decree are affirmed. The subcontractor is to have costs of this appeal.
So ordered.
NOTES
[1] Maryland Casualty Company and the Commonwealth.
[2] Later repealed by St. 1957, c. 682, § 2, but continued in effect by § 3 of the 1957 statute with respect to any contract executed pursuant to any invitation for bids issued prior to the effective date of that statute.
[3] "24-02. Scope of Work: The work under this section consists of furnishing all equipment, materials, labor and services ... required for the completion of the [h]eating, [v]entilating and [p]iping indicated on the accompanying plans and as later specified. (a) This work shall include the systems in the following: [Here follows a list of buildings]...." Further provisions of § 24-02 refer to physical characteristics of particular aspects of equipment.

"24-03. Temporary Heat (a) The permanent heating system to be installed under this Section shall be employed to deliver temporary heat for thoroughly drying out the building, or portion thereof, after the building, or portion thereof, has been throughly enclosed as specified in Section 1, Supplementary General Conditions, sub-section 1-18. Exposed direct radiators may be temporarily set for this purpose. Concealed radiators and central fan heating equipment shall be erected and piped in their permanent positions in time to provide such temporary heat.
"(b) After the building, or a portion thereof, has been enclosed for drying out, either temporarily or permanently, it shall thereafter be maintained continuously at a temperature not less than 50 degrees [n]or more than 75 degrees Fahrenheit until the final acceptance of the work.
"(c) Any portion of the permanent heating installation employed for furnishing temporary heat shall be ... put into first class condition before the final acceptance of the work.
"(d) The [h]eating & [v]entilating [s]ubcontractor shall test the boilers, oil burners, tunnel mains and the heating system, section by section as specified elsewhere, and make them available for temporary heat when required" (emphasis supplied).
Section 1 of the Supplementary General Conditions of the General Contract between Jefferson and the Commonwealth contained the following provision:
"1-15. Temporary Heat: (a) Until acceptance of all work under this contract, the Contractor shall provide temporary heating, covering and enclosures as directed by the Architect and as necessary to protect all work and material against damage by dampness and cold, to dry out the building properly, and to facilitate the completion of the work. All apparatus, hoisting devices, fuel, water, electricity, attendance, ash removal and other items reasonably incidental to such, shall be provided and paid for by the Contractor.
"(b) The permanent heating system shall be used for drying out the building. Any other method of drying out ... must be entirely furnished by the General Contractor and may be used only if approved by the Architect.... The portion of the building to be dried out must be thoroughly enclosed ... by the General Contractor. Where the permanent heating system is used for drying out the building, the operation of the valve and of the system shall be furnished under Section 24, Heating and Ventilating, as therein specified" (emphasis supplied).
Clause (c) is the same, except for punctuation, as clause (b) of § 24-03 quoted above in this footnote.
[4] The prime contract defines "contractor" as "the party or parties contracting to perform the work covered by this contract or ... [their] legal representatives." "Division" refers to the Commonwealth's division of building construction.
[5] In view of this interpretation, we need not consider (a) whether and to what extent art. III may still have force after acceptance of the project with respect to matters arising under arts. XXIII and XXV, or (b) whether the architect's interpretation of January 11, 1957, should be disregarded in any event because so plainly erroneous as to substitute in effect a new contract for the contract which the parties made, within principles discussed in Benjamin Foster Co. v. Commonwealth, 318 Mass. 190, 205, and in Morgan v. Burlington, 316 Mass. 413, 420.