LINDA M. STRAND *vs.* HERRICK & SMITH & others.[1]

Suffolk. December 5, 1985. — February 18, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & NOLAN, JJ.

*Contract,* Construction of contract, Performance and breach, Settlement
agreement, Condition precedent. *Bailment. Practice, Civil,* Findings by
judge, Attorney's fees.

Where an agreement settling an employment dispute contained language
specifically incorporating by reference a certain letter of even date with
the agreement, which set forth undertakings by the employee's counsel
respecting the disposition of papers which the employee had retained
from her long-term employment, the letter was properly treated as part
of the agreement and the employee and employer were bound by its
terms. [786]

Under the terms of an agreement settling an employment dispute, a law
firm's custody of a certain document, which the employee had retained
from her employment, was intended for the purpose of obstructing the
employee's discretionary access to the document. [787-788]

Provisions in a settlement agreement, under which a law firm was to have
custody of a document and deliver it upon the occurrence of a stated
condition, required the firm to deliver the document upon an objective
showing that the condition had occurred, and did not invest the firm
with independent judgment as to whether the condition had occurred.
[788]

In an action by a former employee of a clinic, seeking delivery to her of
a memorandum prepared by the physician in charge of the clinic concern-
ing a medical consultation by him in 1944 with the late President Franklin
Delano Roosevelt, this court, determining that a contrary finding by a
judge in the Superior Court was clearly erroneous, concluded that certain
expressions of opinion in several articles and letters written by historians
and members of the medical profession constituted "posthumous criti-
cism" of the physician's conduct respecting the consultation and his
failure to make a public report thereof, so as to fulfil a condition embodied
in a 1962 agreement settling an employment dispute between the plaintiff
and the clinic, upon the occurrence of which a law firm was to deliver
the memorandum to the plaintiff for publication by her if she saw fit.
[789-791]

---

[1] Several partners of the law firm and the Lahey Clinic Foundation, Inc.

Where a judgment for the defendants in a civil action was reversed by this court on the merits, the trial judge's award of attorney's fees to one of them pursuant to G. L. c. 231, § 6F, was set aside. [791-792]

CIVIL ACTION commenced in the Superior Court Department on May 31, 1984.

The case was heard by *Jeremiah J. Sullivan,* J., sitting under statutory authority.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Richard P. Melick* (*Robert P. Powers* with him) for the plaintiff.

*Edward B. Hanify* (*Roscoe Trimmier, Jr.,* with him) for Lahey Clinic Foundation, Inc.

*Richard K. Willard,* Acting Assistant Attorney General of the United States, *William F. Weld,* United States Attorney, *Leonard Schaitman & Marc Johnston* of the District of Columbia, Attorneys, United States Department of Justice, for National Archives and Records Administration, amicus curiae, submitted a brief.

HENNESSEY, C.J. In this action the plaintiff seeks the return of certain papers which she had delivered to her former attorneys, the firm of Herrick & Smith. The Lahey Clinic Foundation, Inc. (clinic), a former employer of Strand and a party to an alleged agreement by which Strand had relinquished the papers to the law firm, was granted leave to intervene as a party defendant. After a nonjury trial in the Superior Court, judgment was entered for the defendants. Strand was ordered to pay the defendants the sum of $5,000 as a contribution to their attorney's fees. Strand appealed. We transferred the case here on our own motion, and now reverse.

1. *Custody of the "Lahey Memorandum."*

This case involves the custody and disposition of a memorandum written by Dr. Frank H. Lahey regarding the health of the late President Franklin Delano Roosevelt. It is agreed between the parties that the "Lahey memorandum" is a matter of potential historical significance.[2] Strand contends that the

---

[2] We acknowledge the amicus brief of the National Archives and Records Administration.

memorandum was given to her by Dr. Lahey; that it is her personal property; that she delivered this document to her attorneys, Herrick & Smith, during the pendency of her employment dispute with the clinic, and that she is entitled to its return. The clinic maintains, and the trial judge concluded, that Strand relinquished this memorandum to her attorneys pursuant to a settlement agreement with the clinic, and that the condition precedent to its redelivery to Strand under the terms of this agreement has not yet occurred.

We summarize the facts as shown by the judge's findings. Strand was employed as business manager of the clinic for a period of thirty-three years. Dr. Frank H. Lahey was the founder and physician in charge of the clinic. Strand worked closely with Dr. Lahey during her employment, and became his personal friend and confidante. Strand was named executrix in Dr. Lahey's will.

In April, 1944, Dr. Lahey was called into consultation with respect to the health of Franklin Delano Roosevelt.[3] Dr. Lahey later prepared a memorandum regarding his examination of President Roosevelt. Dr. Lahey gave this memorandum to Strand, with instructions that if Dr. Lahey should ever be posthumously criticized for his conduct relating to his consultation with President Roosevelt, and his failure to make a public report thereof, the memorandum was to be published if Strand saw fit.

Dr. Lahey died in 1953. Strand left her employment with the clinic soon thereafter. Her termination was the subject of a lawsuit by Strand against the trustees of the clinic. On October 19, 1962, the parties to that lawsuit entered a settlement agreement by which Strand agreed to release all claims against the clinic in exchange for a lump sum payment, specified monthly payments until her death, and certain retirement benefits under the clinic pension plan. This settlement was signed by Strand

---

[3] It is clearly undisputed, as shown in the briefs of the parties, that President Roosevelt was then serving his third term as President and that Dr. Lahey examined the President at the White House.

President Roosevelt was elected to a fourth term of office in November, 1944. He died on April 12, 1945.

in the presence of her attorneys. The parties have abided by this agreement since its inception, and Strand continues to derive substantial benefits from the agreement in the form of monthly payments. The judge properly concluded that this was a valid and binding contract supported by good and sufficient consideration.

Under paragraph eight of the settlement agreement, the clinic released Strand from all further obligations except those "with respect to information and documents possessed by her which are set forth in a separate letter from Herrick, Smith, Donald, Farley & Ketchum to Edward Hanify of even date with this agreement." In a letter also dated October 19, 1962, and addressed to Mr. Edward B. Hanify, attorney for the clinic, Strand's counsel outlined the disposition of certain papers which Strand had retained from her employment at the clinic, including "a document written by Dr. Lahey in relation to the health of a well-known former statesman . . . ." Counsel for Strand indicated that the "Lahey memorandum" would be delivered to Herrick & Smith "to be held by this firm until such time . . . the document should be redelivered to Mrs. Strand in order that she may carry out the conditions upon which it was given to her."

The judge properly concluded that this letter was part of the settlement agreement between Strand and the clinic, and that both parties are thus bound by its terms regarding the disposition of the "Lahey memorandum." Paragraph eight of the settlement agreement expressly incorporates by reference this letter executed on the same date. Paragraph eleven provides that "[t]his Agreement, with its exhibits and supplementary documents, *letters,* and papers delivered simultaneously herewith, express the entire agreement of the parties . . ." (emphasis added). Because Strand signed the October 19, 1962, settlement agreement, which explicitly refers to a letter of the same date regarding her papers, it must be presumed that she assented to the terms of the letter as well. See *Farm-Rite Implement Co.* v. *Fenestra Inc.,* 342 Mass. 427 (1961) (construction specifications incorporated by reference in subcontract); *Fred C. McClean Heating Supplies, Inc.* v. *Jefferson Constr. Co.,* 339 Mass. 356 (1959) (same).

The issue before us concerns the legal significance of this letter governing the disposition of the "Lahey memorandum."[4] At the outset of the letter, counsel for Strand reiterated the desire of both parties to keep the settlement agreement "confidential." He then addressed the subject of documents retained by Strand during her employment at the clinic, indicating that "a fairly large number of miscellaneous papers" which "have no contemporaneous importance to anyone" had been delivered by Strand to Herrick & Smith and destroyed. Finally, the letter provides: "The document excepted from the foregoing is a document written by Dr. Lahey in relation to the health of a well-known former statesman whose identity is known to both you and me. Mrs. Strand was given this document by Dr. Lahey with instructions that if Dr. Lahey should ever be posthumously criticized for his conduct in relation to his consultation and his failure to make a public report thereof the document was to be published if Mrs. Strand saw fit. That document will be delivered to this firm to be held by this firm until such time comes, if it ever does, that the document should be redelivered to Mrs. Strand in order that she may carry out the conditions upon which it was given to her. In the event of Mrs. Strand's death the document will be destroyed if it is still in our possession." The parties to the agreement disagree as to the appropriate construction to be given this paragraph.

Strand argues that she delivered the "Lahey memorandum" to her attorneys for the purpose of safekeeping, and that the letter merely evidences the parties' understanding that Herrick & Smith would retain the memorandum in its "vault" until such time as Strand requested its return. According to Strand, the delivery of the "Lahey memorandum" to her legal representative for an unspecified period of time created a bailment at will revocable at the pleasure of Strand. See *Warren* v. *Ball,* 341 Mass. 350 (1960); *Herries* v. *Bell,* 220 Mass. 243 (1915).

---

[4] Strand offers arguments that the letter is of no significance because it has not been sufficiently identified, and because of the operation of the Statute of Frauds. See G. L. c. 259 (1984 ed.). Due to the reasoning we apply, it is not necessary for us to consider these arguments.

The trial judge ruled, we think properly, that the terms of the letter do not create an unconditional bailment. If such a bailment had been intended, no letter to the clinic outlining the agreed disposition of the "Lahey memorandum" would have been required; Herrick & Smith, as attorneys for Strand, would be bound under principles of contract law and professional ethics to return their client's papers upon request. The letter must be construed to give reasonable effect to each of its terms, so as not to render any provision superfluous. *McMahon* v. *Monarch Life Ins Co.,* 345 Mass. 261 (1962). *Malden Knitting Mills* v. *United States Rubber Co.,* 301 Mass. 229 (1938). Thus the letter must be interpreted to invest custody of the "Lahey memorandum" in Herrick & Smith for the purpose of obstructing Strand's discretionary access to the document.

The judge concluded that the intention of the parties in drafting this letter was to invest Herrick & Smith with independent judgment regarding whether and when the condition precedent to the document's redelivery to Strand had occurred. Thus he reasoned that since evidence of "posthumous criticism" was not presented to Herrick & Smith's satisfaction, Strand is not entitled to redelivery of the "Lahey memorandum." We think that this construction of the letter is clearly erroneous. On its face, the letter does not invest Herrick & Smith with any such discretion. The letter provides that the "Lahey memorandum" would be held by Herrick & Smith "until such time comes, if it ever does, that the document should be redelivered to Mrs. Strand in order that she may carry out the conditions upon which it was given to her." The condition precedent to redelivery is posthumous criticism of Dr. Lahey. In the absence of any language endowing Herrick & Smith with discretion regarding the eventual disposition of the memorandum, a fair and reasonable construction of the letter requires redelivery to Strand upon an *objective* showing of "posthumous criticism," irrespective of Herrick & Smith's subjective judgment. See *Shea* v. *Bay State Gas Co.,* 383 Mass. 218, 222-223 (1981) (principles of contract interpretation), and cases cited.

The only remaining issue is whether Dr. Lahey has been "posthumously criticized for his conduct and his failure to make a public report thereof," thus entitling Strand to repossession of the "Lahey memorandum." The judge decided that the evidence presented by Strand did not rise to the level of posthumous criticism of Dr. Lahey. Upon review of the entire record, we conclude that this "ruling" was clearly erroneous.[5]

The evidence on this final issue, as introduced by Strand, was entirely documentary. Although the judge made no findings of fact as to the authenticity of this evidence, it is clear from the record and the briefs of the parties that the genuineness of the documents is not in dispute.[6] We thus summarize this documentary evidence.

Strand produced several articles and letters written by historians and members of the medical profession suggesting that President Roosevelt was gravely ill near the end of his third term of office, including a journal article by Dr. Harry S. Goldsmith entitled "Unanswered Mysteries in the Death of Franklin D. Roosevelt," 149 Surgery, Gynecology & Obstetrics 899 (Dec. 1979). In the article, Goldsmith cites a 1951 letter to the New York Times from James A. Farley, a cabinet member during

---

[5] The judge's conclusion that Dr. Lahey has not been "posthumously criticized," although included under the heading "Rulings of Law," might properly be considered a "finding of fact" regarding the nonoccurrence of this condition precedent. See *Weismann* v. *Snyder,* 338 Mass. 502, 505 (1959) (in appropriate instances, reviewing court may disregard form of conclusions, and treat ruling of law as ultimate finding of fact). As such, it is entitled to great deference, and will not be disturbed on appeal unless clearly erroneous. Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). See *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 674-675 (1977).

[6] Because we conclude that the judge's decision on "posthumous criticism" was clearly erroneous, see note 5, *supra,* we need not decide whether we shall follow the Federal construction of Fed. R. Civ. P. 52(a) (1985), and apply the "clearly erroneous" test "to all findings, regardless of the nature of the evidence." *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 621 n.11 (1985), quoting 9 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2587, at 741 (1971). *Anderson* v. *Bessemer City,* 470 U.S. 564 (1985). We note that the Federal construction of rule 52(a) differs from the practice prior to the adoption of Mass. R. Civ. P. 52 (a). Our prior practice permitted an appellate court to "draw [its] own conclusions from documentary evidence unaffected by the conclusions of the court below." *Ward* v. *McGlory,* 358 Mass. 322, 323 (1970).

the Roosevelt administration, in which the author stated that "[i]n 1944 it was widely known among political leaders that FDR was a dying man." *Id.* at 906. Dr. Goldsmith suggests that "[t]hose in the·White House that saw [Roosevelt] the most, especially his daughter, Anne Boettiger, and his secretary, Grace Tully, became increasingly alarmed about his condition." *Id.* at 900. Goldsmith contends that "a rumor has persisted for over a quarter of a century that a malignant condition might have been the cause of Roosevelt's final progressive anorexia and weight loss." *Id.* at 908. According to Goldsmith, such rumors are fostered by the "almost nonexistence of health information available on Franklin D. Roosevelt" and the fact that "an autopsy was not done" on the President's body. *Id.* at 900, 908.

In a 1970 letter from Dr. Samuel M. Day to Dr. Hugh L'Etang, the author related an alleged account of Dr. Lahey's consultation with the President: "On completion of the examinations it was Dr. Lahey's opinion that President Roosevelt had an advanced cancer of the stomach, apparently too far advanced for a surgical cure to be considered. Dr. Lahey told the President his diagnosis, told him he was gravely ill and should not run for a fourth term."

Two other authors have addressed the possibility that Dr. Lahey knew of President Roosevelt's condition yet failed to make such information public. In Dr. L'Etang's book, The Pathology of Leadership (1970), the author states: "Only the doctors can proffer an opinion about Roosevelt's competence to discharge his obligations and, apart from [Vice Admiral] McIntire, they have remained silent. After more than twenty years they are still bound by professional secrecy and by loyalty to the dead President." In an as yet unpublished work on the history of the Lahey Clinic, Dr. David Boyd has written: "Whether or not a post mortem was performed, the disappearance of the charts is still an intriguing aspect of the mysterious death of President Roosevelt. It may well be that the entire entourage — McIntire, Bruenn, Paullin and Lahey — slept more comfortably when the case was closed. The silence afterwards by the ordinarily direct and honest Lahey is especially

hard to accept. . . . Were these well-intentioned doctors who cared for FDR guilty of what, in the seventies, became known as the ultimate in political chicanery, the 'cover-up.'" Elsewhere in the piece, Dr. Boyd characterizes a letter written by Lahey to Vice Admiral McIntire regarding the President's health as "evasive, disingenuous and intellectually less than honest."

In essence, the evidence presented suggests that Dr. Lahey was part of a conspiracy of silence regarding President Roosevelt's ill health. These opinions, regardless of their validity, constitute posthumous criticism of Dr. Lahey "for his conduct in relation to his consultation and *his failure to make a public report thereof*" (emphasis added). The condition precedent to Herrick & Smith's redelivery of the "Lahey memorandum" has occurred. Strand is entitled to possession of the memorandum.[7]

2. *Attorney's Fees.*

The award of attorney's fees to the defendant Lahey Clinic under G. L. c. 231, § 6F (1984 ed.), was improper.[8] As the foregoing analysis indicates, Strand's action clearly was not "wholly insubstantial, frivolous and not advanced in good faith"

---

[7] The clinic argues that redelivery of the memorandum to Strand might jeopardize President Roosevelt's interest in medical privacy, were Strand to publish or otherwise release the document. Assuming, arguendo, that the "Lahey memorandum" involves confidential, medical information obtained as a result of the physician-patient relationship, and thus subject to protection from disclosure under our decision in *Alberts* v. *Devine,* 395 Mass. 59 (1985), the clinic has no standing to assert the privacy interests of President Roosevelt.

[8] There is some doubt whether the issue of attorney's fees is properly before this court. Any appeal from the Superior Court's award of attorney's fees under G. L. c. 231, § 6F, lies to a single justice of the Appeals Court, and must be filed within ten days of receiving notice of the decision. G. L. c. 231, § 6G (1984 ed.). The appeal does not properly lie to the full bench of the Appeals Court, *Atwood* v. *Best Buick, Inc.,* 21 Mass. App. Ct. 70 (1985), or to this court on transfer therefrom. Neither party has briefed or argued this issue. We address the issue of attorney's fees only by necessity: implicit in our reversal on the merits is a finding that Strand's action was not "insubstantial, frivolous and not advanced in good faith" within the meaning of c. 231, § 6F.

within the meaning of G. L. c. 231, § 6F. In addition, the judge failed to comply with the explicit directives of c. 231, § 6F, which require that the judge include in his order "specific facts and reasons" for his findings, as well as "the method by which the amount of the award was computed." Failure to comply with these requirements in and of itself warrants reversal of the order.

The judgment for the defendants and the order granting them attorney's fees are reversed. A judgment shall be entered which requires Herrick & Smith to deliver the "Lahey memorandum" to Strand.

*So ordered.*