DANIEL E. STRIAR & others[1] vs. AMERICAN MEDICAL
INTERNATIONAL, INC., & another[2]; WESTWOOD/PEMBROKE
CORPORATION, third-party defendant. .

No. 97-P-0103.

Middlesex. March 25, 1998. - June 18, 1998.

Present: FLANNERY, GILLERMAN, & DREBEN, JJ.

*Contract,* Third party beneficiary, Settlement agreement. *Hospital.*

In a breach of contract action, a master correctly concluded that the
defendants' failure to obtain the plaintiff's written approval of a settlement
agreement, which served to modify the terms of a service contract entered
into by the defendants, rendered the settlement agreement null and void,
where the language of a purchase agreement among the defendants and the
plaintiff, of which the service contract was a part, precluded such a
modification without the written approval of the plaintiff. [94-97]
A contract for the sale of two hospitals, whereby the buyer agreed, as of the
date of the sale, to assume and perform certain payment obligations of the
sellers under a service contract between the sellers and a medical corpora-
tion, required the sellers to reassume such obligations upon the date of oc-
currence of a certain condition, and the buyer was not liable to the sellers
on the medical corporation's claim for money owed on the service contract
after that date. [97-100]
A Superior Court judge properly concluded, in a breach of contract action,
that the defendants did not engage in unfair or deceptive acts or practices
in violation of G. L. c. 93A, § 11. [100-101]
Where a medical service corporation properly assigned to a third party all of
its claims arising out of an action against the defendants for nonpayment
for services rendered, a Superior Court judge's calculation of damages
incorrectly failed to give full effect to the assignment [101-103]; further,
the matter was remanded for recalculation of the damages to deduct pay-
ments due for services rendered during a period when the defendants had
properly assigned their payment obligations to a third party [103-104].
In an action for breach of a service contract, the record supported the judge's
finding that the contract was not a contract for discrete services and pay-

[1]Brims Distributing Company, a limited partnership (Brims), by Daniel
Striar as its general partner; and the Michael Striar Trust, the Steven Striar
Trust, the Brian Striar Trust, and the Susan Striar Trust, as its limited partners;
and Psychiatric Associates of Norfolk County, Inc., intervening plaintiff.
[2]AMI Woodbroke, Inc.

ments and that the date of breach for any specific payment was not clearly established, so that the plaintiffs were entitled to statutory interest from the date of the filing of the action, rather than from the date of breach. [104-105]

CIVIL ACTION commenced in the Superior Court Department on December 6, 1993.

The case was heard by *Hiller B. Zobel*, J., on a master's report, and judgment was entered by him.

*Michael P. Angelini* for American Medical International, Inc., & another.

*Paul L. Feldman* (*Gary S. Matsko* with him) for Daniel E. Striar & others.

*Charles L. Janes*, for Westwood/Pembroke Corporation, was present but did not argue.

GILLERMAN, J. The defendants, American Medical International, Inc. (AMI), and its subsidiary AMIWoodbroke, Inc. (AWB), appeal from the judgment entered for the plaintiff Brims Distributing Company (Brims)[3] in this breach of contract action and from the dismissal of their third-party complaint against Westwood/Pembroke Corporation (WPC). The plaintiffs cross-appeal from the amount of the judgment and interest thereon, as well as from the dismissal of their G. L. c. 93A claim.

The plaintiffs instituted this action on December 6, 1993. AMI and AWB thereafter filed a third-party complaint against WPC.[4] Psychiatric Associates of Norfolk County, Inc. (PANC), was allowed to intervene as a party plaintiff on May 6, 1994.[5] See note 3, *supra*. All parties moved for an order of reference to a master under Mass.R.Civ.P. 53, as amended, 423 Mass. 1408 (1996). The case was heard by the master pursuant to the Superior Court judge's order of reference, the parties waiving their rights to object to the master's report pursuant to Mass.R. Civ.P. 53(h)(2), 365 Mass. 817 (1974), but preserving all rights

[3]Brims was the assignee of all claims of the other plaintiffs as well as the intervening plaintiff.

[4]Two other defendants, American Health Properties, Inc., and AHE of Westbrook, Inc., were dismissed from the action on April 19, 1995, with separate and final judgment entered pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974).

[5]It has filed no brief on appeal.

on appeal.[6] The judge adopted the master's forty-two page report, and entered judgment for Brims on December 3, 1996, in the amount of $2,724,182, representing Striar's share of the amounts owed to PANC by the defendants, plus statutory interest from the date the complaint was filed.

We summarize the material facts involved in the seven-year history that led to this litigation, taking those facts from the master's report. The plaintiff, Daniel Striar, and Gary Jacobson, M.D., who is not a party to these proceedings, together owned, controlled (directly or indirectly), and operated two psychiatric hospitals, Westwood Lodge Hospital, purchased in 1973, and Pembroke Hospital, purchased in 1984. In or around 1975, Striar and Jacobson decided that a professional corporation should be formed to provide health care services at Westwood Lodge Hospital, with the hospital's medical staff employed by the corporation rather than by the hospital. Jacobson incorporated PANC and became its controlling shareholder.

PANC was organized in 1975 as a medical professional corporation. Because Striar, who was not a medical professional, could not be a shareholder of PANC, Striar entered into a long-term management agreement with PANC to serve as its sole and exclusive managing agent.[7] His compensation was set at an amount equal to fifty percent of the "corporate net income before taxes calculated on a cash accounting basis." When Striar and Jacobson acquired Pembroke Hospital in 1984, PANC became the exclusive provider of professional care there as well.

In 1984, Striar and Jacobson began negotiations with representatives of AMI, an international hospital holding company interested in purchasing the two hospitals. On September 13, 1985, Striar and Jacobson, along with certain corporate entities connected with the hospitals, entered into a purchase agreement with AMI and AWB, a wholly owned subsidiary of AMI formed for the acquisition of the hospitals.[8] The purchase agreement provided for the purchase of all the as-

---

[6]The master did distribute a draft report to counsel, and they commented on that draft.

[7]We express no opinion regarding the legality of the corporate structure of PANC.

[8]Other parties to the purchase agreement were Westwood Lodge Corporation, Pembroke Hospital, Inc., and Bardan Company, which owned the Westwood Lodge Hospital real estate.

sets of the hospitals and the related real estate for a total purchase price of $37,500,000, subject to adjustments. Section 13.15 of the purchase agreement provided that AMI was the guarantor of all the obligations of its subsidiary, AWB, the buyer under the purchase agreement.

Striar and Jacobson were parties to the purchase agreement individually and were described therein as the "primary shareholders" of the two hospitals. In addition, Striar and Jacobson were bound by the representations and warranties set out in section 7 of the purchase agreement.

The obligation of the plaintiffs to complete the transaction was subject to, inter alia, the execution of a ten-year contract between AMI and PANC (the PANC contract), under the terms of which PANC would be the exclusive source of clinical and medical-administrative services for the hospitals after the sale. A material term of the PANC contract (which was executed on June 6, 1986, two days before the closing) was the provision for AMI's guarantee of the obligations of its subsidiary AWB, the purchaser of PANC's services, in addition to AMI's guarantee of all obligations of AWB under the purchase agreement.

Though Striar was not a party to the PANC contract, he participated in its negotiation and he informed AMI representatives of his management agreement with PANC and his entitlement to fifty percent of PANC's profits as compensation for his services as the exclusive managing agent of the hospitals. The PANC contract itself stated that it was in consideration for the purchase of the hospitals, and it was included as a schedule to the purchase agreement. Section 13.13 of the purchase agreement provided that all schedules to the agreement were "considered a part [of the purchase agreement] as if set forth herein in full."

Two additional clauses are important to the resolution of this controversy. Section 13.5 of the purchase agreement provided for the survival of representations, warranties, and agreements. The general provision was that all such undertakings survived the closing only for a period of two years. The exception to the two-year limitation was any undertaking "whose specific language expressly recites a term greater than two years." Section IV of the PANC contract expressly recited a term of ten years. Section 13.14 of the purchase agreement provided that the purchase agreement could be "modified" only by a written instrument signed by "each of the parties hereto" or their authorized representatives.

Thus, for a period of ten years, any material change in the provisions of the PANC contract required the signatures of all the parties to the purchase agreement. This interlocking arrangement was of special importance to Striar whose compensation was measured by PANC'S profits but who was not an officer, director, or stockholder of PANC. From the point of view of Striar, the master found, the PANC contract was an important inducement for his assent to the sale of the hospitals to AMI. The contract documents assured him that for a period of ten years there could be no detrimental modification of the PANC contract without his prior written consent. On June 6, 1986, two days before the closing, Striar assigned to Brims "his management rights" under his long term contract with PANC.[9]

Sometime after acquiring the hospitals on June 8, 1986, AMI began to question Striar's billing practices under the PANC contract. Among other things, AMI disagreed with the amounts Striar was billing, his billing format and supporting documentation, and the services and costs for which he was claiming reimbursement. Although AMI made substantial payments to PANC under the PANC contract, it refused to pay the disputed amounts.

By December, 1989, Jacobson and representatives of AMI had agreed that Jacobson, in the name of WPC, would repurchase the hospitals from AMI; Striar was not a party to the transaction. As part of WPC's purchase, Jacobson, as president of PANC, but without Striar's approval, agreed to accept $2,300,000 as payment in full by AWB and AMI (as the guarantor and parent of AWB) of all the disputed amounts under the PANC contract through December 31, 1989 (the settlement agreement).

Striar objected to the settlement agreement; he believed that PANC was owed substantially more than the amount to which Jacobson had agreed. Nevertheless, the settlement agreement was signed by Jacobson as president of PANC, and Striar pursued AMI to secure payment to PANC in accordance with the terms of the settlement agreement. Eventually, the entire $2,300,000 was paid to PANC.

WPC purchased the two hospitals from AMI and AWB on

---

[9]The terms used in the assignment were not entirely clear. The reference to "management rights" would seem to refer to Striar's right to receive fifty percent of PANC's net profits, and not to any of Striar's duties as manager of PANC. Brims, PANC, and Jacobson were all parties to the assignment.

October 5, 1990. As part of the purchase agreement (titled the Assumption Agreement), WPC agreed with AMI and AWB to assume and perform, inter alia, the PANC contract.

Simultaneously, AWB and AMI entered into an agreement (titled the Agreement, a copy of which appears in Appendix I to this opinion) with PANC and WPC modifying the commitments of AWB and AMI. At the outset, the Agreement recited that WPC was "willing" to acquire the hospitals if AWB and its guarantor, AMI, remained liable under the PANC agreement "under certain limited conditions." The Agreement then specified the "limited conditions": "if and only if" the "Psych Under 21" program, a Medicaid-funded and highly profitable program at the hospitals for children and adolescents, "is eliminated at any time prior to the termination of the PANC Agreement." Upon the occurrence of that event, AWB would remain obligated under the PANC contract, and AMI's guaranty of AWB's obligations under the PANC contract would be in "full force and effect." The master, with ample justification, found that the program was discontinued in 1992.

Striar, thereafter, encountered problems securing payment from WPC for services provided under the PANC contract. In 1993, Striar instituted this litigation. WPC sold the hospitals to a third party in 1995, and as part of that transaction the PANC contract was terminated, and PANC assigned to Brims any recovery PANC might obtain[10] in the litigation before us. On that same date, Striar and Jacobson agreed that Jacobson, individually, would participate in any recovery in this litigation against AMI and AWB.

After hearing the evidence, the master determined that the parties had a genuine dispute over the interpretation of the PANC contract. Although he found no bad faith on AMI's part, the master concluded that the settlement agreement, lacking Striar's signature, was a nullity, and that AMI, as guarantor of AWB's obligations and as the alter ego of AWB, was in breach of the PANC contract by failing to pay all of sums due PANC from the date AMI acquired the hospitals to the date WPC sold the hospitals. Moreover, the master found for WPC on AMI's third-party complaint.

Judgment was entered in favor of Brims, see note 3, *supra.*

---

[10]As noted earlier, PANC was permitted to intervene as a party plaintiff in 1994. Brims, as PANC's assignee, was admitted as a party plaintiff following the close of the hearings.

The master concluded that "the shortfall in payments" by the defendants to PANC was $5,448,363, and that Brims was entitled to fifty percent of that amount. The fifty percent reduction was applied by the master to avoid Jacobson's sharing in the recovery (which would occur if the judgment ran in favor of PANC in the full amount of the shortfall), and because "allow-[ing] more to the [plaintiffs] would permit a windfall to them beyond the [fifty percent] of PANC profits which [being Striar's share of PANC's net income] is the keystone of this entire claim against AMI and AWB."[11]

We accept the master's findings of fact as being fully supported by the record before us, and we agree with his conclusions nullifying the settlement agreement. However, we disagree in part with the master's conclusions regarding the plaintiffs' damages.

1. *AMI's and AWB's appeal.*

*a. Introduction.* AMI and AWB challenge the master's determination that the settlement agreement is without force and effect.[12] They argue that the settlement agreement was executed by a duly authorized officer of PANC, and Striar, who was merely an employee of PANC, is not entitled to avoid the binding effect of the settlement agreement. They also dispute the master's ruling that under AMI's third-party complaint WPC was not liable to AMI for money AMI owed under the PANC contract during WPC's ownership of the hospitals beginning January 1, 1990. This argument is based on the claim that WPC agreed in writing to assume and perform the PANC contract when the hospitals were sold back to WPC. On their cross appeal, the plaintiffs argue that the master erred in reducing their

[11]Among the documents before the master was exhibit 99, which provided for the assignment of all claims of PANC to Brims and permitted Jacobson to participate in any recovery by the plaintiffs in this action. The agreement is dated February 28, 1995, shortly after WPC sold the hospitals to a third party. The master recognized Brims as the plaintiff in whose favor the judgment ran, but he decided not to consider the terms of this agreement regarding Jacobson's sharing in the recovery.

[12]The master found that the PANC contract was incorporated into the purchase agreement, that Striar, individually, was a party to the purchase agreement, that the purchase agreement could not be modified without the consent of the signatory parties, and that the settlement agreement was a modification of the purchase agreement because the PANC contract had been modified by the settlement agreement. Alternatively, he found that Striar was a third-party beneficiary of the purchase agreement.

recovery of the shortfall in payments due PANC by fifty percent, and in the calculation of interest on the judgment.

*b. Standard of review.* The findings of the master, whose report was adopted by a judge of the Superior Court,[13] are not to be set aside unless they are clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). The burden falls on the defendants, as appellants, to persuade us of clear error on the master's part and not simply to show that there is another permissible view of the evidence. *Gallagher* v. *Taylor*, 26 Mass. App. Ct. 876, 880-881 (1989). See Smith & Zobel, Rules Practice § 52.7 (1977 & Supp. 1998). If, or to the extent that, there was no clear error in the findings of the master, the only remaining question is whether those findings support the master's legal conclusions. *Gallagher* v. *Taylor, supra* at 880. See generally *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 509-510 (1997). With these standards in mind, we turn to the defendants' arguments on appeal.

*2. Striar's rights under the purchase agreement and the invalidity of the settlement agreement.* AMI argues that Striar was not a party to the PANC contract, that he was only a non-professional employee of PANC, and that the settlement agreement which purported to settle all outstanding claims of PANC against AMI and AWB was binding on PANC because, as a matter of corporate law and business practice, it was duly authorized and executed by the president, Jacobson.

The argument does not meet the threshold contractual issue: assuming, as the master found, that the settlement agreement modified the PANC contract and, therefore, was a modification of the purchase agreement, did the purchase agreement, to which Striar was a party, preclude such a modification of the purchase agreement without Striar's approval?

Relying on the express language of section 13.13 of the purchase agreement ("Each Certificate and Schedule to this Agreement shall be considered a part hereof as if set forth herein in full"), as well as the provisions of section 13.14 ("This Agreement [including all Schedules and Exhibits attached hereto] is intended by the parties hereto to be the final expression of their agreement"), the master concluded that the

---

[13]Findings of a master, to the extent adopted by the court, are considered findings of the court. Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996).

PANC contract was a part of the purchase agreement.[14] Further, the master concluded that the purchase agreement (including the PANC contract), under the express language of section 13.14 ("This Agreement may be modified only by a written instrument signed by authorized representatives of each of the parties hereto"), required Striar's approval for any material change in the terms or conditions of the purchase agreement to become effective.

To these rulings, with which we agree, there must be added the provisions of section 13.5 referred to earlier, i.e., that the agreements within the purchase agreement survived the closing date for a period of two years, except for those undertakings "whose specific language recites a term greater than two years." Since the PANC contract expressly recited a term of ten years beginning June 8, 1986 (the closing date of the sale of the hospitals), and since the PANC contract was fully a part of the purchase agreement, any modification to that contract required the approval of each party to the purchase agreement including Striar.[15] The master appropriately cited *Chase Commercial Corp.* v. *Owen*, 32 Mass. App. Ct. 248, 250-251 (1992) (interlocking documents, because they are part of a single transaction and are "interrelated in purpose," must by read together to effectuate the intention of the parties).[16] See *Stand* v. *Herrick & Smith*, 396 Mass. 783, 786 (1986) (signatory to a settlement

[14]The master found that the PANC contract was annexed to the purchase agreement five months after the date the purchase agreement was signed. Striar, the master found, initialed the schedule. There was no material difference, the master found, between the PANC contract attached as a schedule to the purchase agreement, and the PANC contract signed by the parties on the closing date. This procedure, the master found, was expressly contemplated by the provisions of section 13.13 of the purchase agreement. We agree with the master's analysis.

[15]The master also concluded that Striar was a third-party beneficiary of the PANC contract, and for that reason as well Striar's approval to the modification of the purchase agreement was required. We need not discuss this issue in view of the conclusions we reach based on the express provisions of the purchase agreement.

[16]AMI argues that the master was wrong because the effect of his ruling would be to give Striar veto rights over all scheduled agreements affecting the operation of the hospitals. We need not respond to this argument; it is sufficient to note that the PANC contract, involving substantial sums of money annually, was plainly a material inducement to the sale of the hospitals by Striar and Jacobson. Since Striar's compensation was pegged to the operating profits of PANC, it would be violating the intention of the parties — not to

agreement, which incorporated by reference a letter written by her attorney, was presumed to have agreed to the obligations set forth in the letter as well as in the agreement), citing *Farm-Rite Implement Co.* v. *Fenestra Inc.*, 342 Mass. 427 (1961), and *Fred C. McClean Heating Supplies, Inc.* v. *Jefferson Constr. Co.*, 339 Mass. 356 (1959).

Finally, in support of its claim that the settlement agreement reached by Jacobson and AMI was binding on Striar, AMI argues that the settlement agreement was not a "modification" of the PANC contract and therefore not a modification of the purchase agreement.[17]

The compensation formula under the PANC contract was complex. The master devoted thirteen detailed paragraphs to an explanation of the formula and its operation. In brief, the contract provided for a base figure of $322,550, which was explicitly subject to numerous adjustments, and which base amount was "ratcheted upwards" annually. In contrast to that detailed, formulaic approach to the calculation of PANC's compensation, AMI and Jacobson, rather than making any attempt to apply the contract terms to PANC's outstanding claims, simply agreed in the settlement agreement to a flat amount due PANC: $1,500,000 due for the period beginning June 8, 1986, and ending June 30, 1989, and $800,000 for the period ending December 31, 1989. In fact, the master found that the amount due PANC for these periods was substantially larger. By substantially reducing the amount due PANC, and by failing to adhere to the agreed method for calculating amounts due PANC,

---

mention the express terms of the purchase agreement — to permit material alterations of the PANC contract without the approval of Striar.

AMI also argues that Striar's approval was not required because the second sentence in section 13.14 (requiring the signatures of all parties for a modification of the purchase agreement) does not refer to any schedule or exhibit expressly incorporated into the purchase agreement. The argument ignores the language of the first sentence which makes all schedules and exhibits a part of the purchase agreement for all purposes.

[17]We do not discuss arguments that rest on facts either not found by the master, or proposed facts that were expressly rejected by the master. For example, AMI argues that Striar induced the settlement "without disclosing any objection." The master found, with ample justification in the record, that Striar "did not consent to the settlement agreement. On the contrary, he objected to it before its execution."

Jacobson and AMI modified the PANC contract,[18] and the failure to obtain Striar's approval to the modification nullified the settlement agreement, as the master concluded.

There remain the claims against AMI for amounts due PANC for the period following December 31, 1989.

3. *AMI's liability to PANC for services following the settlement agreement, and AMI's third-party claim against WPC.*

*a.* The period following the settlement agreement and until WPC repurchased the hospitals (January 1, 1990 to October 5, 1990) may be disposed of quickly. AMI's defense is merely that Striar was a stranger to PANC's claims. The argument ignores the fact that PANC assigned its claims against AMI to Brims, and both Brims and PANC are plaintiffs in this action. AWB and AMI are responsible to Brims for PANC's claims during this period.

*b.* As to the period following Jacobson's repurchase of the hospitals from AMI on October 5, 1990, two contracts, both dated October 5, 1990, were executed, as noted above, as part of the contractual arrangement attendant to that event. One, the Assumption Agreement, was signed by AWB, AMI, and by Jacobson's corporation, WPC. Under its terms, WPC agreed with AMI and AWB to assume and perform the obligations of AWB and AMI under scheduled contracts and agreements, including the PANC contract.[19, 20]

The second contract (the Agreement, see Appendix I) was signed by PANC, AMI, AWB, and WPC, and qualified the

[18]AMI also relies on Striar's pursuit of the settlement proceeds. As the master pointed out, Striar was bound by his fiduciary obligations to PANC to collect amounts due PANC.

[19]Paragraph XI of the PANC contract expressly permitted AWB's sale of the hospitals upon the condition that the purchaser assume AWB's obligations to PANC. Thus, Striar's consent to the Assumption Agreement was not required. Moreover, neither paragraph XI nor paragraph XVII of the PANC contract, regarding AMI's guarantee of the obligations of AWB, called for any continuation of the AMI guarantee following a sale by AWB, nor would such a continuation make sense once AWB, the primary obligor under the PANC agreement, see Restatement (Third) of Suretyship and Guaranty, § 1(2)(a) (1996), transferred all its interest in the hospitals to a third party. See also note 21, *infra.*

[20]By inadvertence, the documentation of the reference to the PANC contract in the Assumption Agreement was omitted. We agree with the defendants that the record should have been enlarged to admit that documentation, the validity and authority of which is undisputed, but the point is of no significance because we conclude that AMI has no claim against WPC.

Assumption Agreement. The Agreement provided for (i) the continuation of AWB's contractual obligations to PANC notwithstanding the assumption of the PANC agreement by WPC, and (ii) the continuation of AMI's guarantee of the obligations of AWB to PANC under the PANC contract; provided, however, that each of these two commitments would "remain in full force and effect if and only if" the Medicaid-funded program for children known as "Psych Under 21" (the program) is eliminated "at any time prior to the termination of the PANC agreement."[21] In fact, the master found that the program was discontinued in 1992, prior to the expiration of the ten-year term of the PANC contract.

The Agreement is not without its interpretive difficulties. Since the program was in fact eliminated in 1992, the question is whether the parties intended that the resumption of the liability of AMI and AWB for payments due PANC would take effect retroactively to October 5, 1990, or whether those obligations were to take effect only as of the date of the elimination of the program? The Agreement does not expressly deal with the point.[22]

We conclude that the parties intended the latter alternative. The underlying economic consideration that led to agreement on the resumption of the defendants' obligations was the highly

---

[21]Since AMI had guaranteed AWB's performance of the PANC contract, and that guarantee expired upon the sale of the hospitals by AWB, a new undertaking by AMI would be required if AMI was to resume responsibility for the performance of the PANC contract after AWB's sale of the hospitals. See note 19, *supra*. Thus, the parties executed the Agreement calling for the resumption of AWB's and AMI's obligations to PANC upon the condition described. The master concluded that Striar's consent to the Agreement was required because AMI's guarantee had been modified by the Agreement. We disagree. We conclude, as we point out in note 19, *supra*, that AMI's guarantee expired upon the sale of the hospitals. The Agreement merely re-established AMI's expired guarantee upon the expiration of the program, and Striar's consent to the new arrangement was not required. The master's finding that the Agreement lacked the necessary consent of Striar led to his conclusion that AMI's guarantee was never interrupted.

[22]There was evidence that WPC made some intermittent payments under the PANC contract, but the master found that after the sale of the hospitals to WPC, WPC "failed to pay sums due." In any event the terms of the Agreement govern the rights of the parties. See note 18, *supra*, regarding Striar's fiduciary obligations.

profitable operation of the program.[23] If the resumption, then, were to be made retroactive to a date preceding the elimination of the program, WPC would be the beneficiary of a substantial windfall. WPC would then be in the position of receiving PANC's services, including the fees received for the program, while paying nothing for them, and AMI would be paying essentially damages for an ongoing profitable program. There would be no basis for WPC to demand, or the defendants to have agreed, to a retroactive application of the resumption of AMI's original obligations to PANC. See *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 795 (1986) (contract must be construed so as to yield "a workable and harmonious means for carrying out and effectuating the intent of the parties").

The substance of what was agreed upon, then, among PANC, WPC, AMI, and AWB, was that, if and when the program were eliminated, WPC would not thereafter be the loser for having purchased the hospitals from AMI and AWB. In this fashion, we give "great weight" to the "principal purpose of the parties," see Restatement (Second) of Contracts § 202(1) (1981), leaving no part of the contract unreasonable, *id.* at § 203(a).

Thus, different consequences follow depending on when the program terminated. For the period beginning October 5, 1990, and continuing until the termination of the program in February, 1992,[24] WPC, under the Assumption Agreement, was bound to AMI to be responsible for the payments to PANC, and AMI and AWB were not responsible to PANC under the original PANC contract or otherwise. PANC, the intended beneficiary of WPC's commitment to AMI, see *Choate, Hall & Stewart* v. *SCA Services, Inc.*, 378 Mass. 535, 534-544 (1979), had a claim against WPC for services rendered to WPC's hospitals during this period, but has not asserted any claim against WPC in these proceedings. See Mass.R.Civ.P. 14(a), as amended, 385 Mass. 1216 (1982). Neither PANC nor Brims is entitled to any recovery from AWB or AMI for services rendered during this period. Whether, on general equity principles, Jacobson should be charged is not before us.

---

[23]The profitability of the program was implicit in the Agreement which made the resumption of AMI's guarantee contingent upon the termination of the program. In addition, there was substantial evidence to this effect.

[24]The date of termination of the program is not clearly established in the record. On remand, the judge will have to receive evidence and make findings on this issue.

Liabilities change for the period beginning with the termination of the program and ending upon the sale of the hospitals by WPC and the termination of the PANC contract. During this period, AMI and AWB became directly responsible to PANC for the payment of PANC's services. Because WPC, not AMI, received the benefit of those services, the question arises whether AMI may recover on its third-party claim against WPC.

AMI argues that it has a good claim against WPC because WPC, in the Assumption Agreement, agreed with AMI to assume and pay sums due PANC under the PANC contract.[25]

We reject that argument, as did the master. The Assumption Agreement states the general case: assuming that everything would continue "as is," WPC agreed with AMI to assume responsibility of the PANC contract. In the Agreement the parties did foresee one important problem: the termination of the "Psych Under 21" program. We have said earlier that the parties qualified the Assumption Agreement to take account of the termination of that program. They agreed that in such event WPC was not to be the loser. Indeed, the Agreement recites that the resumption of AMI's guarantee upon the termination of the program was essential to WPC's agreement to purchase the hospitals. Were we now to allow the third-party claim of AMI for all sums due PANC, we would undo a valid bargain the parties struck in the Agreement: AMI agreed to protect WPC against the financial consequences if and when the program were terminated. See *Collins* v. *Kiewit Constr. Co.*, 40 Mass. App. Ct. 796, 800 (1996) (in the circumstances, statute will not be construed to impose a limitation "on a valid bargain struck by the parties"). See also *School Comm. of Lynnfield* v. *Trachtman*, 11 Mass. App. Ct. 524, 530 (1981).

4. *AMI and AWB did not violate G.L. c. 93A.* The master found that "AMI and AWB had genuine and substantial differences of opinion with PANC as to amounts claimed by PANC under the PANC contract. . . . Plaintiffs' claim of unfair dealing is not proved and is directly contradicted by plaintiffs' own witnesses who repeatedly testified that [AWB] and AMI never

---

[25]AMI's argument is that the Assumption Agreement calls upon WPC to be responsible for the performance of all obligations under the PANC contract "irrespective of the continuing validity of AMI's guarantee." The argument does not take into account the simultaneously executed Agreement and the fact that Assumption Agreement and the Agreement must be construed together.

refused to pay bills they believed were justifiably owed, that the amounts PANC claimed were owed were legitimately in dispute, and that [AWB] and AMI at all times acted in good faith."

The master concluded that AMI and AWB "did not engage in unfair or deceptive acts or practices in violation of G. L. c. 93A, § 11."

The master's findings of fact were not clearly erroneous, and we see no basis to disagree with his conclusions.

5. *Damages.* Following the close of the hearing, the master allowed the plaintiffs' motion, dated October 7, 1996, to amend their complaint. The amendment added Brims as a plaintiff and permitted Brims, as assignee of the claims of Striar and PANC (PANC, by agreement dated February 28, 1995, having assigned to Brims all its claims against AWB and AMI arising out of the present litigation), to assert PANC's claims against AWB and AMI for the entire period beginning June 8, 1986 (the date AMI purchased the hospitals) and ending December 31, 1994 (the effective termination of AMI's responsibility and WPC's ownership of the hospitals prior to the sale to third parties in February, 1995).

A preliminary note to the following discussion. The master accepted the detailed calculations of the defendants' expert, Christopher C. Barry, as to amounts due PANC for the entire period beginning June 8, 1986 and ending December 31, 1994. See Appendix II. The master did not accept, nor do we, Barry's conclusion that $4,306,931 was the total amount of the plaintiffs' damages (made up of 50% of PANC underpayments for the settlement period and 100% of the underpayments for all succeeding payments).

*a.* First, as to the period covered by the settlement agreement (June 8, 1986 through December 31, 1989), the total of PANC's unpaid claims for the entire period beginning June 8, 1986, and ending December 31, 1994, was $5,448,363. (We assume that this final balance was after recognizing the $2,300,000 payment by AMI to PANC pursuant to the settlement agreement.) Of the $5,448,363, Barry, and thus the master, attributed $2,282,863 to the period June 8, 1986, through December 31, 1989, the period covered by the settlement agreement. Thus, the master's award to Brims, via PANC, includes 50% of $2,282,863, or $1,141,432 for the settlement period. In his cross appeal, Striar does not challenge the master's award for the settlement period, but AMI argues that the settlement is binding on Striar and, therefore, he

was entitled to nothing for this period. We have concluded, however, that the settlement agreement is a nullity, and since Striar's cross appeal does not challenge the master's award of $1,141,432 for the settlement period, we affirm this portion of the award.

b. As to the period following the end date of the settlement agreement, the master declined to give full effect to the assignment to Brims of 100% of PANC's claims.[26] Instead, he awarded Striar, and therefore Brims, Striar's fifty percent share of PANC's claims of $3,165,500 for unpaid services[27] for the period beginning January 1, 1990, and ending December 31, 1994. Thus Striar, the master found, was entitled derivatively, and Brims was entitled as his assignee, to $1,582,750.

The master declined to give full effect to the assignment in order to (i) prevent a "windfall to . . . [Striar and Brims] beyond the [fifty percent] of PANC profits [which] is the keystone of this entire claim against AMI and AWB," and (ii) to prevent Jacobson from sharing in the proceeds. The disqualification of Jacobson was put on two grounds: (i) Jacobson was not a plaintiff in this action, and (ii) Jacobson, as president of PANC, "and in consideration of his becoming part owner of the hospitals, supplied a release to AMI and AWB of PANC's claims against them." For these reasons, the master concluded, the assignment from PANC to Brims "has no bearing on the essential reasoning."

We disagree. The release applied only to the period ending December 31, 1989, and while Striar makes no claim, as we have said, beyond the master's award of fifty percent of unpaid bills during the settlement period, he does claim 100% of PANC's unpaid bills for the period beginning January 1, 1990, through December 31, 1994. Except for the period beginning October 6, 1990, when WPC acquired the hospitals, and ending with the termination of the program, PANC has valid claims against AMI on its guarantee and against AWB. Those claims were properly assigned to Brims as part of the final arrangements among PANC, Striar, and Jacobson preparatory to Jacob-

[26]The assignment effectively conveyed all the rights of PANC, the assignor. See Larabee v. Potvin Lumber Co., 390 Mass. 636, 642 (1983). Without citation to relevant authority, the defendants challenged the validity of the assignment in their reply brief. The record provides no basis for that challenge.

[27]The master found that PANC had no creditors, and that all amounts due PANC constituted net profit to it.

son's sale of the hospitals to third parties and the termination of PANC's contract. Jacobson and Striar signed the agreement (which incorporated both the assignment and Jacobson's participation rights) individually, and Jacobson signed as president of PANC and WPC. See note 11, *supra.* We see no reason to refuse recognition of that assignment. Jacobson's right of participation is a matter of agreement between Striar and Jacobson, and their agreement, including any possible windfall to Jacobson, is not an issue in this case.

Moreover, the result we reach is not unfair to AMI or AWB. We have concluded nothing more than that they are bound by the agreements they signed.

In summary, our analysis of the distribution of responsibility for amounts due PANC yields the following:

*a. Period I* begins June 8, 1986, the date of the sale of the hospitals to the defendants and the assumption by AWB and AMI of responsibility for amounts due PANC. The period ends December 31, 1989, the effective end date of the settlement agreement for this period.

As discussed in the text, Brims is entitled to an award of $1,141,432 for this period. Since AMI was, during this period, the guarantor of PANC's receivables from the defendants, Brims, by assignment from PANC, is entitled to a judgment against AMI and AWB for this period.

*b. Period II* begins January 1, 1990, and ends October 5, 1990, the date WPC purchased the hospitals from the defendants and assumed responsibility for amounts due PANC.

AMI's guarantee of amounts due PANC continues following the expiration of the settlement agreement until WPC purchased the hospitals on October 5, 1990. Brims, as PANC's assignee, is entitled to judgment against AMI and AWB for the full amount due PANC during this period.

*c. Period III* begins October 6, 1990, and ends in February, 1992 (the exact date not appearing in the record before us[28] ), the period during which the "Psych Under 21" program terminated and AMI's and AWB's responsibility for amounts due PANC resumed.

WPC, as previously described, purchased the hospitals on October 5, 1990, and agreed with AWB and AMI under the Assumption Agreement dated October 5, 1990, that it assumed

[28]See note 24, *supra.*

responsibility for amounts due PANC. Further, under the Agreement of the same date among PANC, AMI, AWB, and WPC, PANC agreed under paragraph 2 that the obligations of AWB and the guarantee of AMI are effective "if and only if" the program is eliminated. The program was not eliminated during this period, and the plaintiffs have no claim against either AWB or AMI.

*d. Period IV* begins in February, 1992,[29] and ends December 31, 1994 (the date of the sale of the hospitals by WPC and the termination of AMI's responsibility).

Under the Agreement dated October 5, 1990, AWB's obligation, and AMI's guarantee of that obligation, to pay amounts due PANC resumes by reason of the termination of the program, and the plaintiffs are entitled to recover in full from these defendants for all amounts due PANC arising out of services rendered by PANC during this period.

We have assumed — as should the judge on remand — that the schedule appearing in Appendix II, which shows a total of $5,448,363 due PANC from June 8, 1986, through December 31, 1994, the amount accepted by the master, is accurate as to all details shown on the schedule, except that the amounts shown to be due PANC must be reduced by charges attributable to period III, and the columns captioned "Damages awarded to Plaintiffs" and "Plaintiffs' Damages" should be disregarded.

In short, the task on remand is merely to (i) confirm the award of $1,141,432 for period I, and (ii) after determining the amounts of PANC's claims for period III, confirm an award of $3,165,500 for the remaining periods, minus the amount of PANC's claims for period III.

6. *Calculation of prejudgment interest.* The plaintiffs argue that they are entitled to statutory interest from the date of breach or demand, rather than from the date of suit, as the master ordered. Applying interest in accordance with G. L. c. 231, § 6C, the master found that "[n]o satisfactory evidence was offered establishing the date of breach or demand, and accordingly prejudgment interest is to be calculated from the date of suit."[30]

It was the plaintiffs' burden to prove that they were entitled

---

[29]See section c and note 24, *supra.*

[30]General Laws c. 231, § 6C, as inserted by St. 1993, c. 140, § 224, provides in pertinent part: "If the date of the breach or demand is not

to interest for periods prior to filing suit. See generally *Louise Caroline Nursing Home, Inc.* v. *Dix Constr. Corp.*, 362 Mass. 306, 312 (1972). The plaintiffs reply that the master's own findings established the breach at least as early as December 31, 1989, the end date of the settlement agreement. Because the master went on to find that the settlement agreement was without effect on them, the plaintiffs argue that interest should be awarded back to December 31, 1990, the point at which payments for services rendered through December 31, 1989, became due under the PANC contract's payment formula. The fact that the defendants were held liable for underpayments for services rendered prior to December 31, 1989, does not translate into a finding of a specific date of breach for interest purposes.

Our review of the record reveals that the pattern of billing and payments between the parties was irregular, at times almost informal, and, as the master noted, the defendants' payments under the PANC contract apparently were not generally earmarked for particular bills or services. The record supports the master's finding that this was not a contract for discrete services and payments and that the date of breach for any specific payment was not clearly established. See *Starr* v. *Fordham*, 420 Mass. 178, 195 (1995) (date of breach was not sufficiently established under § 6C, where the judge made no finding as to either the date of the breach or whether the plaintiff made a demand). Compare *Sterilite Corp.* v. *Continental Gas. Co.*, 397 Mass. 837, 841-842 (1986) (the dates of the insured's payment of bills for legal expenses, which should have been paid by insurer, were readily ascertainable for purposes of applying prejudgment interest for breach of duty to defend); *Hawes Office Sys., Inc.* v. *Wang Labs., Inc.*, 580 F. Supp. 812, 822 (E.D.N.Y. 1984) (an award of interest under G. L. c. 231, § 6C, in a diversity action for wrongfully withheld commissions should be calculated from the dates on which each commission became due under the plaintiff's agency agreement).

So much of the judgment as dismissed the plaintiffs' c. 93A claim is affirmed. So much of the judgment as dismissed the third-party claim of AMI and AWB against WPC is affirmed. The balance of the judgment heretofore entered in favor of the plaintiffs is vacated. This case is remanded to the Superior Court for the calculation of the plaintiffs' damages consistent

---

established, such interest shall be added by the clerk of the court from the date of the commencement of the action."

with this opinion, and the entry of a final judgment in favor of Brims.

*So ordered.*

APPENDIX I.

Agreement dated as of October 5, 1990 by and among Westwood/Pembroke Corporation, a Massachusetts corporation ("WPC"), Psychiatric Associates of Norfolk County, Inc. a Massachusetts corporation ("PANC"), American Medical Holdings Inc., a Delaware corporation ("AMI"), and Amiwoodbroke, Inc., Massachusetts corporation ("Amiwoodbroke").

WHEREAS, as of the date hereof, WPC, AMI and Amiwoodbroke have entered into an Asset Purchase Agreement (the "Purchase Agreement") pursuant to which WPC is acquiring from Amiwoodbroke the personal property and business operations of the Westwood Lodge Hospital and the Pembroke Hospital (the "Hospitals");

WHEREAS, pursuant to an Agreement (the "PANC Agreement") dated June 8, 1986 among Amiwoodbroke, AMI and PANC, AMI has guaranteed (the "AMI Guarantee") the obligations of Amiwoodbroke to PANC under the PANC Agreement;

WHEREAS, in connection with the acquisition of the Hospitals, WPC will acquire Amiwoodbroke's rights under the PANC Agreement and will assume (without PANC releasing Amiwoodbroke) certain obligations accruing after the date hereof under the PANC Agreement, and WPC is willing to acquire the Hospitals if Amiwoodbroke remains obligated under the PANC Agreement under certain limited conditions and if AMI acknowledges the assignment of the PANC Agreement to WPC and agrees to remain obligated under the AMI Guarantee under certain limited conditions; and

WHEREAS, Amiwoodbroke is willing to remain obligated under the PANC Agreement and AMI is willing to remain obligated under the AMI Guarantee under certain limited conditions as provided herein;

NOW, THEREFORE, in consideration of these premises and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Amiwoodbroke and AMI, Amiwoodbroke and AMI hereby agree with WPC and PANC as follows:

1. *Obligation of Amiwoodbroke.* Amiwoodbroke agrees that, notwithstanding the assumption by WPC of certain obligations under the PANC Agreement Amiwoodbroke shall remain obligated under the PANC Agreement and shall not be released by virtue of assumption of the PANC Agreement by WPC in accordance with the provisions of this Agreement; *provided however,* Amiwoodbroke's and AMI's obligations hereunder shall not apply to extensions of or amendments to the PANC Agreement.

2. *AMI Guarantee.* AMI acknowledges the assignment of the PANC Agreement to WPC and Amiwoodbroke's continuing obligations under the PANC Agreement and AMI hereby confirms the AMI Guarantee and WPC and PANC agree that the AMI Guarantee and the obligations of Amiwoodbroke shall remain in full force and effect if and only if the "Psych Under 21" medicaid

program, as applied to the Hospitals, is eliminated at any time prior to the termination of the PANC Agreement.

3. *PANC Assurances.* The obligations of Amiwoodbroke and guarantee of AMI generally described herein shall apply only to sums payable under the PANC Agreement taking into account the adjustment of expenses resulting from adjustments in work force attributable to fluctuations in patient volumes, and the transfer of employees between PANC and the Hospitals.

4. *Miscellaneous.* This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. This Agreement shall binding upon and inure to the benefit of the successors and assigns of the parties hereto.

AMERICAN MEDICAL HOLDINGS, INC.

BY: S/_____

TITLE: _____

AMIWOODBROKE, INC.

BY: S/_____

TITLE: _____

WESTWOOD/PEMBROKE CORPORATION

BY: S/_____

TITLE: _____

PSYCHIATRIC ASSOCIATES OF NORFOLK COUNTY, INC.

BY: S/_____

TITLE: _____